Charles K. McKinley

March 27, 2006

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT

 2        FOR THE MIDDLE DISTRICT OF ALABAMA

 3              NORTHERN DIVISION

 4

 5  CHARLES McKINLEY,

 6       Plaintiff,
                              CIVIL ACTION FILE
 7       vs.
                              NO. 2:05-CV-00562
 8  PETSMART, INC.,

 9  AND AL WILLIAMS,

10       Defendants.

11  ~~~~~~~~~~~~~~~~~~~~

12

13              DEPOSITION OF

14            CHARLES K. McKINLEY

15

16            March 27, 2006

17              9:45 a.m.

18

19

20         Littler Mendelson, P.C.

21            Suite 1100

22         3348 Peachtree Road

23         Atlanta, GA  30326

24

25      Thomas R. Carey, CCR-B-1715
```

Charles K. McKinley

March 27, 2006

1    recurring factor, you know.  It may have --

2    you know, I believe that -- should I shut my

3    mouth?

4              MS. HARDING:  No.

5              THE WITNESS:  It had just seemed to

6         me that, you know, the jobs that I

7         applied for, either online where I had

8         listed Petsmart, you know, as a former

9         employer, or ones that I had, you know,

10        gone personally and filled out

11        applications where I filled out my past

12        employment, you know, either they took

13        the application and I never made it to

14        the interview process, or if I made it to

15        the interview process, I was not hired,

16        you know, after that, after that fact.

17             So when I moved over to Atlanta, I

18        made a decision to leave it off.  I

19        didn't want anything, you know, I was at

20        the point I didn't want anything else

21        coming in between my new life I was

22        trying to start.

23        Q.    (By Mr. Benson) Where is the first

24   place you applied for work after leaving

25   Petsmart that you think a bad reference kept

Charles K. McKinley

March 27, 2006

```
 1   you from getting a job?

 2        A.    Petco Corporation.

 3        Q.    When was that application?

 4        A.    That application was the day after.

 5        Q.    The day after you left Petsmart?

 6        A.    That is correct.

 7        Q.    On that application you listed prior

 8   employment with Petsmart, right?

 9        A.    That is correct.

10        Q.    What did you say about why you left

11   Petsmart in writing?

12        A.    In writing?

13        Q.    Did you have to say anything?

14        A.    I didn't have to say anything.

15        Q.    So you got an interview?

16        A.    That is correct.  I drove to

17   Opelika, Alabama for an interview with the

18   District Manager.

19        Q.    What was the District Manager's

20   name?

21        A.    To be quite honest, I couldn't tell

22   you.

23        Q.    In response to Interrogatory Number

24   6 you talk about speaking with Joe who was a

25   store manager?
```

Charles K. McKinley

March 27, 2006

```
 1        A.    That is correct.

 2        Q.    Okay.

 3        A.    I worked with Joe previously at Best

 4   Buy, and he -- so I knew him, and he had gone

 5   to work for Petco.

 6        Q.    So is he the one that recommended

 7   you to this District manager?

 8        A.    That is correct.

 9        Q.    So you meet with the District

10   Manager, and I guess at some point in that

11   interview you were asked what did you do at

12   Petsmart?

13        A.    That is correct.

14        Q.    So you described your duties?

15        A.    Yes, sir.

16        Q.    Did you get into a discussion of why

17   you left?

18        A.    No, I did not.  When I left the

19   interview, he was feeling positive about it, I

20   was feeling positive about it.  And I actually

21   filled out all of my prehire paperwork,

22   everything, down to the drug test and

23   everything, left and, you know, as I left, he

24   sent me to fill out my drug test and all of

25   that, which I did.  And he asked -- the only
```

Charles K. McKinley

March 27, 2006

```
 1   thing that he said was that they would be

 2   getting me into training soon.  The only thing

 3   he had to do before he got me into, I guess

 4   training for the position was that he had to

 5   contact my past employers.  I told him, okay,

 6   that was fine.

 7        Q.   Okay.  And so how many days is it

 8   before you hear back from them?

 9        A.   It had to have been the next day or

10   the day after that.

11        Q.   And who called you?

12        A.   Nobody called me.  I actually went

13   into the store to see Joe.

14        Q.   What is Joe's last name?

15        A.   I couldn't tell you, sir.

16        Q.   So when you go into the store, what

17   happens with regard to your possible

18   employment?

19        A.   You know, I basically asked Joe, I

20   said, you know, "Have you heard back from the

21   District Manager?"

22             And Joe tells me, you know, right to

23   my face, he said, "Listen, he hadn't had a

24   chance to call you yet.  The District Manager

25   called me and told me that he was going to
```

Charles K. McKinley

March 27, 2006

```
 1    pass on you."

 2              I said, "Well, Joe, what happened?"

 3    I said, "You know, I've done all this

 4    paperwork, you know, when I left he was

 5    feeling positive about me, I was feeling

 6    positive about the job.  The only thing left

 7    that he had to do was, you know, contact my

 8    former employers."

 9              And Joe said, "I don't know.  He

10    just told me to call you and tell you that he

11    was going to pass."

12         Q.   Did you ever talk to the District

13    Manager?

14         A.   No.

15         Q.   So you don't have any personal

16    knowledge about whether he ever called

17    Petsmart, do you?

18         A.   No, I don't.  All I have is the

19    knowledge that he said that he was going to

20    contact my previous employers.  And knowing

21    that I was applying for a pet store doing that

22    job function, in my mind, the person that he

23    would contact to find out, you know, from

24    Petsmart, you know, what my job title was and

25    information as to that effect.
```

Charles K. McKinley                                                                    March 27, 2006

1        Q.    Okay.  Now, is there another job

2    that you applied for before you got the

3    Charter job?

4        A.    Yes, sir.  I've applied for a slew

5    of jobs.

6        Q.    Did you hear back from any of them

7    that they had checked references?

8        A.    I did hear back from several jobs.

9        Q.    Let me try to jump ahead instead of

10   bogging you down.  You suspect that the reason

11   you didn't get the Petco job was because of a

12   bad reference?

13       A.    Yes, that's correct.

14       Q.    Are there any other jobs that you

15   suspect you didn't get further into the

16   interview process because of a bad reference

17   from Petsmart?

18       A.    I don't know that, but I suspect,

19   yes.  I applied for several management

20   positions at several different companies, as

21   of which, I did get a couple of phone calls

22   back from different companies.  I don't

23   remember which ones.  But they honestly gave

24   me a curtesy phone call to say that they were

25   going to pass on me at the present time.

Charles K. McKinley

March 27, 2006

1    Others didn't call me back.  Others I never

2    got further than, you know, the application

3    process.

4         Q.    Did any of these people tell you

5    they had gotten a bad reference from Petsmart?

6         A.    No.

7         Q.    Did any of these companies tell you

8    they had contacted Petsmart?

9         A.    No.

10        Q.    Has anybody ever told you that

11   Petsmart had given you a bad reference?

12        A.    No.

13        Q.    So why do you think that the

14   Petsmart reference is what caused you to not

15   get the Petco job?

16        A.    You know, simply stated, because I

17   had the job.  And I was told I had the job

18   before I left.  You know, the store manager

19   just had to check my previous work references.

20   And quite frankly, that would be the only

21   negative reference to any employment I've ever

22   had.  I've always had satisfactory reviews at

23   every job I've held.  And that would to me be

24   the only thing that I would think that would

25   have caused me not to get that job.

1      Q.    When you were at Petsmart, did you

2  ever have anyone tell you what their policy

3  was with regard to references?

4      A.    It was in the Employee Handbook.

5      Q.    What did --

6      A.    I'm sure -- you know, it's just like

7  every company handbook always states.

8      Q.    Which is what?

9      A.    Generally that they can either tell

10  you that they work there or they don't work

11  there, or that they have to contact another

12  number.

13      Q.    So the Petsmart policy, as is in the

14  Employee Handbook, is that they give neutral

15  references, correct?

16      A.    If I remember correctly.  I just

17  don't in my opinion believe that was followed.

18      Q.    And do you have any evidence for

19  that other than the sequence of your

20  interviews at Petco?

21      A.    No, sir, I don't.

22      Q.    Before you took the Charter

23  Communications job did you turn down any work

24  offers?

25      A.    No, I did not.

Charles K. McKinley

March 27, 2006

1    Q.   The only offer that you're aware of

2   that was withdrawn was the Petco offer, right?

3    A.   That is correct.  Other than people,

4   you know, phone calls that I would get that

5   said that they are going to pass on my

6   application at this time.

7    Q.   Now, immediately leaving Petsmart

8   you went and applied for work at Petco; is

9   that right?

10    A.   That is correct.

11    Q.   So you were able to work at that

12   time; is that right?

13    A.   Of course I was able to work.

14    Q.   You didn't have any physical

15   problems?

16    A.   No.

17    Q.   You didn't have any emotional

18   problems that kept you from working?

19    A.   No, sir, I did not.

20    Q.   Did you ever have any physical

21   problems as a result of your work at Petsmart?

22    A.   No.

23    Q.   Were you ever hospitalized as a

24   result of your work at Petsmart?

25    A.   No.

Charles K. McKinley

March 27, 2006

```
 1      A.    Yes, sir, that's correct.

 2      Q.    Did you play any sports in high

 3   school?

 4      A.    Yes, sir, I did.

 5      Q.    What did you play?

 6      A.    Football.

 7      Q.    What was your position?

 8      A.    I played strong tackle.

 9      Q.    How tall are you?

10      A.    6'4".

11      Q.    How much do you weigh?

12      A.    About 315.

13      Q.    Is that about the size you were when

14   you were at Petsmart?

15      A.    Yes, sir.

16      Q.    Did you ever get disciplined while

17   you were in high school?

18      A.    No, sir.

19      Q.    Did you ever get sent to the

20   Principal's office?

21      A.    Of course.

22      Q.    For what kind of things?

23      A.    Just -- I don't know.  Back-talking

24   to the teacher, I mean, once or twice.  I

25   mean, everybody I think in their high school
```

Charles K. McKinley

March 27, 2006

1    Q.    During this training period in

2    Louisiana, did you review access to the store

3    procedures?

4    A.    Yes, I had to read the -- I had a

5    large training manual that I had to read,

6    Employee Handbook, and other materials.

7    Q.    What was the training manual called?

8    A.    I couldn't tell you what the manual

9    was called.  It was about 500 or 1,000 pages

10   long and covered different aspects and went

11   chapter by chapter where I would have to watch

12   a video and then I would have to take tests.

13   Our store manager would walk me around and do

14   quizzes on what the book covered.

15   Q.    So you were considered a

16   manager-in-training?

17   A.    That is correct.

18   Q.    So you had -- did you have keys to

19   the store?

20   A.    Not that store, no.

21   Q.    Did you go over opening and closing

22   procedures?

23   A.    We did go over opening and closing

24   procedures, but not at that particular time.

25   We actually went over opening and closing

Charles K. McKinley

March 27, 2006

1  procedures when I came back to Montgomery and

2  they had the orientation for the new

3  employees.

4      Q.   Did you get any training in

5  Louisiana about restrictions on the managers

6  for coming into the stores?

7      A.   No.  I believe it was briefly when I

8  went over, like if I was scheduled to be there

9  at 6 o'clock in the morning to open the store,

10  whatever time the store -- if the store opened

11  at, you know, say 10 o'clock, managers may get

12  there, I don't know, 8:00 or 8:30, whatever

13  time I was scheduled to report, there would be

14  some days where I would get there and the

15  manager had already been in the store, you

16  know, for 30 minutes, an hour.  And, you know,

17  just in conversation, you know, he did tell me

18  that there were sometimes that he would come

19  in before everybody else to do paperwork or to

20  do whatever.

21      Q.   When you came back to Montgomery, is

22  that when you got training on opening and

23  closing procedures?

24      A.   There was no formal training that

25  was gone over.  Basically told to come to work

Charles K. McKinley

March 27, 2006

 1    and unlock the store at designated times.  I

 2    believe they had, you know, a speaker come in,

 3    I believe it was their Loss Prevention guy,

 4    basically said, everybody be here when you're

 5    supposed to be here, don't come into a store

 6    unauthorized.

 7         Q.    Do you know who the Loss Prevention

 8    guy was?

 9         A.    No, I do not know his name.

10         Q.    Is that Fred Cramer?

11         A.    Sounds familiar, yes.

12         Q.    So in that presentation you were

13    told, don't come in when not authorized?

14         A.    Yes, sir.  Everybody as a group was

15    told.  It was not singled out toward any one

16    person.  I didn't mean to imply that.

17         Q.    Does that mean you're always

18    supposed to have somebody with you when you

19    enter the store?

20         A.    I would assume so.  Because usually

21    when we would open the store in the morning, I

22    would wait out in the, you know, in the car

23    until, you know, I saw somebody else come in,

24    and we would go in together.

25         Q.    Was that at a time when --

Charles K. McKinley                                              March 27, 2006

1        A.    I believe that was more of a safety

2    for everybody than, you know, it was for, just

3    so something wouldn't happen.  Just as a last

4    person, I would wait until all the employees

5    left at night before I would lock the store

6    up.

7        Q.    Right.  You wouldn't want an

8    employee in the store alone for safety

9    reasons; is that right?

10       A.    That's correct.

11       Q.    Safety in case they slipped or got

12   hurt; is that correct?

13       A.    That's correct.

14       Q.    Safety in terms of crimes as well?

15       A.    Yes, sir.

16       Q.    How did you get into the store in

17   Montgomery, was that a key or --

18       A.    Yes, sir.  It was a keyed entry, and

19   then also had an alarm system where I had a

20   personal code.  Every manager had a personal

21   code to disarm the system.

22       Q.    So there's a key pad on the outside

23   of the door?

24       A.    Inside the door.

25       Q.    How did you get inside the door?

Charles K. McKinley

March 27, 2006

Page 61

1          A.    Yes.

2          Q.    And to your knowledge you did not

3    disclose it to anyone else; is that right?

4          A.    No, sir.  I had it written down in a

5    book that I carried around with me that had

6    other information that I'd learned in

7    training.  Occasionally I misplaced that book,

8    but I don't have any knowledge that anybody

9    else used my code, because they would have had

10   to have a key to get in the store.

11         Q.    So if I understand it right, you're

12   supposed to open the store in the morning.  If

13   you're the manager that opens the physical

14   store, you show up with your key and your code

15   to turn off the alarm, but you don't go into

16   the store until another person shows up,

17   correct?

18         A.    I would usually take the employees

19   in with me at that time, if there was anybody

20   there.

21         Q.    Weren't you instructed that you

22   weren't supposed to be in the store alone?

23         A.    Yes, sir.  That was gone over

24   during, you know, when they instructed the

25   entire store as a whole.

Charles K. McKinley

March 27, 2006

Page 62

```
 1        Q.   Right.  And the same would be true

 2   for closing the store, right?

 3        A.   That's correct, yes.

 4        Q.   When the last person leaves, and

 5   you're supposed to be the manager closing,

 6   you're suppose to leave the store with this

 7   other employee?

 8        A.   That's correct, and walk them to

 9   their car.

10        Q.   Is there any business reason why you

11   as an assistant store manager would need to be

12   there other than work hours?

13        A.   There were reasons such as, if we

14   had to reset a planogram or whatnot, and we

15   may have been asked to stay in the store late

16   or come in early.  The alarm company may have

17   called us to -- because there was an alarm in

18   the store.  I can tell you that I did go in,

19   you know, a few times to check on things in

20   the store.

21        Q.   Okay.  The example you gave of reset

22   some planograms, that would be a scheduled

23   work activity?

24        A.   No, it may not always be scheduled.

25        Q.   Who would tell you to go do the
```

Charles K. McKinley

March 27, 2006

1    A.    We were all on the roster, yes, sir.

2    Another reason maybe for entering the store

3    was maybe we had a truck coming in early in

4    the morning and we needed to unload the truck,

5    and I may have been told to go to the store

6    and unload the truck.

7    Q.    Did anybody ever tell you to enter

8    the store by yourself --

9    A.    No.

10    Q.    -- to unload the trucks?

11    A.    No.  I believe the conversation the

12    one time I did enter the store for that

13    particular person was one of the stock boys or

14    stockmen asked the store manager, Kelli at the

15    time, if she needed him to come in, you know,

16    to also unload the truck.  And she said that

17    would be okay.  She did not tell, she did not

18    say to me, "Charles, you come in, unload this

19    truck by yourself."  She never said that.  But

20    she never again said, you know, "Charles, wait

21    for Dennis to come in and you guys go and

22    unload the truck together."

23    Q.    So did you ever go to the store,

24    open it by yourself and enter by yourself to

25    unload a truck?

Charles K. McKinley

March 27, 2006

```
 1              MR. BENSON:  We'll just move on.

 2              MS. GRUNDY:  Don't guess my weight.

 3              THE WITNESS:  I'm not going to.

 4      Q.    (By Mr. Benson) Before your last

 5   day at Petsmart, had you ever met Al Williams?

 6      A.    Yes.

 7      Q.    And had your dealings with him been

 8   professional?

 9      A.    Yes.

10      Q.    Did you have any problems with Al

11   Williams?

12      A.    No.

13      Q.    Has he ever yelled at you?

14      A.    No.

15      Q.    Has there ever been any improper

16   touching?

17      A.    No.

18      Q.    Were you afraid physically of Al

19   Williams?

20      A.    No.

21      Q.    How tall is Al Williams?

22      A.    6-foot, I guess.

23      Q.    How much does he weigh?

24      A.    I don't know.  170, 180.

25              MS. HARDING:  He has no concept of
```

Charles K. McKinley

March 27, 2006

Page 69

1    weight.

2        THE WITNESS:  I don't.  I know

3    looking at me, I don't look 315 pounds,

4    but I am.

5        Q.    (By Mr. Benson) But before your

6    last day at Petsmart you had not had any

7    particular problems at work with either Kelli

8    Watson or Al Williams; is that correct?

9        A.    No.  As far as Al, never had any

10   run-in's with Al in a negative manner.  You

11   know, I had occasionally had a couple of

12   runs-in's with Kelli where she had gotten

13   upset with me over something or another, but

14   it was just where she, you know, didn't like

15   the way I was doing something or --

16       Q.    Had she ever written you up for

17   anything?

18       A.    She got -- I don't know if she -- I

19   know I signed some paperwork one time, knowing

20   if that was ever actually just her making me

21   sign something or, you know, I couldn't tell

22   you, because it was actually put in my record.

23       Q.    What was that about?

24       A.    It was about I had left some -- when

25   I did the nightly closing procedures and, you

Charles K. McKinley

March 27, 2006

```
 1    know, balance the safe and did the work, I had

 2    not printed out I believe like a report or

 3    something and put it on her desk, or had left

 4    a report out without my signature, because we

 5    had to sign every report that we did.  There

 6    may have been a case.  I can't recall.  But I

 7    know that she did call me in her office or in

 8    the safe room and had words me with me over

 9    that.

10         Q.    Now, what was your position called?

11         A.    I was the Presentation Manager.

12         Q.    Kelli Watson is the store manager,

13    correct?

14         A.    That is correct.

15         Q.    Are there any other managers?

16         A.    Yes.

17         Q.    Who were they below Kelli Watson at

18    the store?

19         A.    You had no assistant store manager.

20    There was another Presentation Manager.  Her

21    name was, quite frankly I couldn't tell you

22    her name.  I can tell you where she came from,

23    she came from Gulf Port, Mississippi with

24    Kelli.

25         Q.    Was it Kristi?
```

Charles K. McKinley

March 27, 2006

Page 73

1    stated, I know exactly what happened.  I just

2    do not know the exact date.

3         Q.   So the --

4         A.   365 of those a year.

5         Q.   The date where you were questioned

6    by Al Williams and Kelli Watson was on

7    August 13, 2004, correct?

8         A.   Yes, sir.

9         Q.   Do you remember what day of the week

10    it was?

11         A.   No, sir, I do not.

12         Q.   Do you remember when you had last

13    worked prior to that day?

14         A.   The day before, yes, sir.

15         Q.   The very day before?

16         A.   Day before or the day right before

17    that, because I was told to reset the

18    planogram on the rawhide aisle.

19         Q.   So you think on 8/11 or 8/12 of 2004

20    you were working?

21         A.   Yes, sir, that's correct.

22         Q.   What hours did you work on 8/12 or

23    8/11?

24         A.   I remember I was closing.  I believe

25    it was the day before he came, because I was

Charles K. McKinley                                                    March 27, 2006

1  told to reset the planogram.  The day he came,

2  I remember that I was not scheduled to come in

3  I believe until 12 o'clock that day, because I

4  believe maybe Kelli had the first part of the

5  day or another manager had the first part of

6  the day.  But because Kelli had told me I

7  needed to get that planogram done, I was there

8  at maybe 5:45, 6 o'clock in the morning to

9  finish what I did not get the night before

10  done with that planogram.

11       Q.    So you were at the store at 5:45 or

12  6:00 a.m. on August 13, is that your

13  testimony?

14       A.    Yes.  I believe it was the day

15  before.

16       Q.    No.  Well, help me here.  On

17  August --

18       A.    The day that Al came to the store.

19       Q.    Is August 13, 2004.

20       A.    Okay.  August 13.  That would be the

21  date that I was there at, real early in the

22  morning.

23       Q.    So you were there at 5:45 or

24  6:00 a.m. on August 13?

25       A.    That is correct.

Charles K. McKinley

March 27, 2006

1    store was not open and I was not there, so he

2    went back home.  I got to the store right

3    after he'd left, called him on a cell phone,

4    and he headed back up that way.  When he got

5    to the store, I locked the store back up.  We

6    went down to Waffle House to get some

7    breakfast, because it was early, had breakfast

8    and then came back and started on the

9    planogram.

10        Q.    Where did you have breakfast?

11        A.    Waffle House.

12        Q.    And it's your testimony that the two

13   of you were working together the night before?

14        A.    That is correct.

15        Q.    So on August 12 the two of you were

16   working?

17        A.    That's correct.

18        Q.    What hours did you work?

19        A.    We probably did not get out of there

20   until midnight.  You know, it was definitely a

21   little bit after the store closed.

22        Q.    When did you -- well, midnight, what

23   time does the store close?

24        A.    9:00 or 10 o'clock.

25        Q.    Midnight is more than just a little

Charles K. McKinley

March 27, 2006

Page 85

1    A.    Right here.

2    Q.    Where is the door into the bathroom?

3    A.    (Witness indicating.)  That's the

4    break room, the bathrooms would be right here

5    and here.

6    Q.    Okay.  Write door next to that?

7    A.    (Witness complies.)

8    Q.    And write break room back here?

9    A.    (Witness complies.)

10   Q.    And the rest of the main floor of

11   the store is filled with product and displays?

12   A.    That is correct.

13   Q.    So tell me what happened when you

14   came back to the store on August 13.

15   A.    What time?

16   Q.    At 12:00 or 1 o'clock.  You come in

17   through the front door; is that right?

18   A.    Yes, sir.  I come in and went

19   probably to -- I may have gone to the grooming

20   department to check on the hourly schedule, I

21   mean, to make sure the dogs had been signed

22   off, make sure the dogs were okay.  I may have

23   walked around the store, and I would have gone

24   back into the warehouse to start working

25   product or -- I know when Al, I believe when

Charles K. McKinley

March 27, 2006

Page 86

```
 1    they called me into their office, I was

 2    probably working stock somewhere in this area.

 3          Q.    Did you clock in --

 4          A.    No.

 5          Q.    -- when you came back?

 6          A.    No.

 7          Q.    Do you ever clock in and out?

 8          A.    No.

 9          Q.    So you were asked to come to the

10    office --

11          A.    Uh-huh.

12          Q.    -- is that right?  Who asked you,

13    was it over the PA system or in person?

14          A.    No.  I believe Al came and got me.

15          Q.    What did he say when he came to get

16    you?

17          A.    "Could you come with me to the

18    office," or something of that nature.

19          Q.    All right.  Let's mark this as

20    Exhibit 3.  And I'm going to ask you to make

21    Exhibit 3 a rectangle that would represent the

22    office.

23          (Marked for identification purposes,

24          Defendant's Exhibit No. 3.)

25          THE WITNESS:  (Witness complies.)
```

Charles K. McKinley

March 27, 2006

Page 87

1      Q.      (By Mr. Benson) All right.  Label

2   that the door.

3      A.      (Witness complies.)

4      Q.     What kind of door is that, is that a

5   door with a window?

6      A.     Yes, it is.  It's a wooden door, and

7   it's got like a, glass like that, but it has

8   little --

9      Q.     Cross marks?

10      A.     Cross marks in it, I believe.

11      Q.     How big is the glass, does it take

12   up half the door?

13      A.     It's probably -- I believe it's a

14   side light, one of those ones that's about

15   this tall.  It was either that or it was a

16   full square solid.

17      Q.     You're not sure which?

18      A.     No.

19      Q.     Full square solid would be --

20      A.     It would be like --

21      Q.     Take up half the door from the

22   middle up?

23      A.     Like take off the glass and have a

24   square like that in it.  I don't remember

25   exactly what it looked like, but I know it was

Charles K. McKinley

March 27, 2006

Page 88

1    a light wood.

2         Q.    Could you see out the door?

3         A.    I never looked out the door.

4         Q.    Through the window?

5         A.    But, yes, you could look out the

6    office door and see.

7         Q.    It was a clear window door, right?

8         A.    Yeah.  Well, not the whole door, no.

9         Q.    But the glass in it was clear?

10        A.    You could see out, yes.

11        Q.    And you could see people and shelves

12   and customers?

13        A.    Yes.

14        Q.    Okay.  Was there any furniture in

15   the room?

16        A.    Yes.

17        Q.    Can you show me what furniture was

18   in there?

19        A.    (Witness indicating.)  I believe

20   there were shelves right here.

21        Q.    Okay.  Were there any chairs?

22        A.    Yes.

23        Q.    How many chairs?

24        A.    Three chairs.

25        Q.    Three chairs.  And when you first

1  went into the office, where were the three

2  chairs?

3       A.   I don't know exactly where they were

4  when I went into the office.  I know where we

5  sat.

6       Q.   Okay.  Show me where you first sat

7  when you went into the office?

8       A.   I was, sat right here.  Kelli Watson

9  was -- now, this is a little bit too wide

10  because I was about right here in front of the

11  door.

12       Q.   Got you.

13       A.   This right here up against this wall

14  was Kelli Watson, and Al was right here.

15       Q.   And is there a phone on the desk?

16       A.   Yes.  It's right here.  Well,

17  computer is right here, then phone.

18       Q.   Does the door open into the office

19  or out of the office?

20       A.   Into the office.

21       Q.   Okay.  Any other furniture that you

22  can think of that's in there?

23       A.   There may have been a file cabinet

24  over here.  But, you know, this is primarily

25  what we used over here, so I don't know if

Charles K. McKinley

March 27, 2006

1    there was a file cabinet there.

2        Q.    So you walk into the office, because

3    Al has found you out on the floor and said,

4    "Can you come to the office?"

5        A.    That's correct.

6        Q.    Do y'all say anything to each other

7    on your way to the office?

8        A.    If we said anything, it was just

9    general chit-chat.

10        Q.    Okay.  Everything is friendly up to

11    that point?

12        A.    Yes.

13        Q.    Who enters the door first?

14        A.    It was either -- I don't know if I

15    entered first.  I don't think I was the first

16    person in and I don't think I was the last

17    person in, because I know that Kelli sat here,

18    Al sat here, and the door was closed behind

19    us.  And I was kind of pushed up, or my chair

20    was back almost against the door.

21        Q.    Was Kelli already in the office when

22    you and Al arrived?

23        A.    I believe she was.

24        Q.    You can't remember if Al came in

25    first or you came in first?

Charles K. McKinley

March 27, 2006

Page 91

1      A.    No, sir.

2      Q.    Who closed the door?

3      A.    I believe Al closed door.

4      Q.    Who talks first?

5      A.    I believe Al talks.  Al carried the

6    majority of the conversation.

7      Q.    Did Kelli Watson say anything during

8    that?

9      A.    I don't think she did.  She may

10   have.  But three quarters of the dialogue I

11   would say was between me and Al.

12     Q.    So as best you can recall, what time

13   is it when you enter the office?

14     A.    Sometime after noon.  After 12:00.

15   The best time maybe, you know, maybe 1:30,

16   maybe 2:00.  I don't know.

17     Q.    Okay.  Tell me the first thing Al

18   says.  And if you would, I know this was a

19   while ago, but try to remember as closely as

20   you can the words that are used, and let's do

21   it like a play where you tell me what words,

22   Al said so and so, I said so and so.  Al

23   speaks first, what does he say?

24     A.    Al speaks first.  And I believe Al,

25   the first part of the dialogue is a bit fuzzy,

Charles K. McKinley

March 27, 2006

1    but I believe he asked me general questions

2    about my job, that sort of thing.

3         Q.    Tell me how he asked the questions,

4    what did he say?

5         A.    At first it was a friendly demeanor.

6         Q.    Well, what I'm asking you to do is,

7    instead of summarizing what the questions

8    were, tell me what he asked?

9         A.    I don't know the first part of the

10   dialogue he asked.  I remember the second part

11   of the dialogue to where I was --

12        Q.    How long does the first part of the

13   dialogue last?

14        A.    Maybe five minutes or so, very

15   quick.

16        Q.    Okay.  What are the topics in the

17   first five minutes, if you can remember the

18   exact words?

19        A.    I don't remember exactly what it

20   was.

21        Q.    Do you remember any of it?

22        A.    Not the first part.  I remember the

23   second part.

24        Q.    Okay.  At the end of the five

25   minutes, have you talked at all?

Charles K. McKinley

March 27, 2006

Page 93

1      A.    Yes.   I mean, I probably said,

2   answered whatever questions he asked.   So, you

3   know, I mean, I couldn't tell you whether he

4   said, how do you like your job.   I couldn't

5   tell you what he said.

6      Q.    Okay.

7      A.    My receptors get real good when I

8   got backed into a corner.

9      Q.    So you can't remember anything of

10   the first five minutes, is that accurate?

11      A.    It may have been five minutes, it

12   may have been two minutes, but, no, I don't

13   remember.   It was just general conversation.

14      Q.    All right.   And what's the first

15   thing you do remember being said?

16      A.    The first thing I do remember about

17   the conversation is Al Watson asking me had I

18   ever been in the store after hours.

19      Q.    As best you can recall, tell me the

20   words he used to ask you that?

21      A.    "Have you ever been in the store

22   after hours?"

23      Q.    What did you say?

24      A.    "Yes, I have."

25      Q.    Who spoke next?

Charles K. McKinley

March 27, 2006

Page 94

```
 1        A.    Al spoke next.

 2        Q.    What did he say?

 3        A.    He asked me, "How many times have

 4   you been in the store after hours?"

 5        Q.    What did you say?

 6        A.    I told him I didn't know exactly how

 7   many times I'd been in the store after hours.

 8        Q.    Who speaks next?

 9        A.    Al speaks next.

10        Q.    What does he say?

11        A.    He says, "To your knowledge, how

12   many times would you have thought you may have

13   been in the store after hours?"

14        Q.    Who speaks next?

15        A.    I speak next, and I tell him that

16   probably five or six times, maybe more, maybe

17   less.  Then I said, "You know, we would have

18   to pull the, you know, pull the alarm thing to

19   find out how many times I'd been in after

20   hours."

21        Q.    Who speaks next?

22        A.    Al speaks next.

23        Q.    What does he say?

24        A.    He asked me why I was in the store

25   after hours.
```

Charles K. McKinley

March 27, 2006

Page 96

```
 1        Q.    Who spoke next?

 2        A.    Al spoke next.

 3        Q.    What did he say?

 4        A.    He asked me what was the reasoning

 5   for me being in the store.

 6        Q.    What did you tell him?

 7        A.    I told him that I had been asked,

 8   you know, a couple of times, especially this

 9   last time, to come into the store, and I

10   believe my words as best I can remember were

11   to do whatever it takes to get the planogram

12   set.  So I told Al that I was in the store to

13   get the planogram done.  You know, that I'd

14   been told by the store manager on, say, one

15   occasion to, you know, do whatever it takes to

16   get the, you know, get the planogram done.

17        Q.    Who speaks next?

18        A.    I believe Al speaks next.

19        Q.    What does he say?

20        A.    He asked me if I had ever taken

21   merchandise out of the store, i.e. dog food.

22        Q.    What did you say?

23        A.    I said, "No, I'd never stolen any

24   merchandise out of the store."  He asked me if

25   I was sure.
```

Charles K. McKinley

March 27, 2006

Page 99

1  merchandise, you know, Puppy Chow out of the

2  store.  And so, therefore, nobody saw me take

3  anything out like that."

4      Q.    Who speaks next?

5      A.    I believe Al speaks next.

6      Q.    What does he say?

7      A.    I believe he says that, or he

8  phrases the question, "Well, what would you

9  say if I told you that I had pictures that

10  somebody took of you taking Puppy Chow out of

11  the store?"

12      Q.    What did you say?

13      A.    I believe my remarks were, "I'd

14  call, I'd say you were a liar and ask you to

15  show me the pictures."

16      Q.    Who talks next?

17      A.    Al talks next.

18      Q.    What does he say?

19      A.    After about this time, Al and I are

20  going back and forth, and about this time is

21  about the time for the first time I tell Al

22  that I'm not going to speak with him any

23  further.  That, you know, I need to get on the

24  phone and I want to call my lawyer.

25      Q.    So you're the one that brought up

Charles K. McKinley

March 27, 2006

1    lawyer?

2        A.    That's correct.

3        Q.    Okay.  You asked to use the phone?

4        A.    Yes.

5        Q.    What was said next?

6        A.    Al said that there was no need to

7    get anybody else involved.  I didn't need a

8    lawyer.  And, you know, I told him, you know,

9    that I was going to call a lawyer, and about

10   this time this is where Al says, around this

11   time is where Al says, "Well, you know, I'm

12   going to need you to sign this paperwork that

13   says that you stole merchandise from the store

14   and give me an accurate account of exactly

15   what you did."

16            This is when the dialogue starts,

17   where I tell Al that I'm not putting down that

18   I stole dog food on any piece of paper,

19   because I never stole dog food from that

20   store.

21       Q.    Okay.  Who speaks next?

22       A.    Al speaks next.

23       Q.    What does he say?

24       A.    Al tells me, to the best that I can

25   remember, and it's pretty dang accurate, that

Charles K. McKinley

March 27, 2006

Page 102

1   going to sign any piece of paper, you know,

2   stating anything.  So about this time I'm

3   pretty much in tears because somebody has, you

4   know, assassinated my character.

5        Q.   So at this stage, Exhibit 1 hasn't

6   been filled out at all; is that right?

7        A.   Probably, my name is probably the

8   only thing that has been put on it.  This form

9   probably took 30 minutes to fill out, because

10  I was in tears, number one, and because he

11  kept wanting me to put that I'd stolen dog

12  food on it, and I was not going to put that

13  down.

14       Q.   So once again you say, "I'm going to

15  call my lawyer"?

16       A.   Uh-huh.

17       Q.   And you're crying at that point?

18       A.   That's correct.

19       Q.   And so who talks next?

20       A.   You know, I tell him that I want to

21  step out of the office.

22       Q.   Okay.

23       A.   You know, and regain my composure.

24  He tells me if I leave that I will be

25  arrested.  You know, I want to say that

Charles K. McKinley

March 27, 2006

Page 103

```
 1    probably more than five times he told me
 2    something to the lines of, "If you leave,
 3    you're going to be arrested."  And about this
 4    time he says, "Well, regardless, you're
 5    already fired."
 6         Q.   All right.  We're going through it
 7    step by step.
 8         A.   Okay.
 9         Q.   At this point you say you're crying,
10    you've told him twice that you're going to
11    call your lawyer?
12         A.   Yes.
13         Q.   That you're not going to admit you
14    stole on the paper that's Exhibit 1, and you
15    said, "I want to step out of the office and
16    regain my composure."
17              And Al says to you, "If you leave,
18    you will be arrested"?
19         A.   That is correct.
20         Q.   And who speaks next?
21         A.   I believe I speak next.
22         Q.   What do you say?
23         A.   I believe when Al at that time, you
24    know, said that, you know, that I could not
25    leave, when he told me that I could not
```

Charles K. McKinley

March 27, 2006

1    leave --

2        Q.    You haven't told me that yet?

3        A.    I just told you that.

4        Q.    No.    What you told me was, Al said,

5    "If you leave, you will be arrested"?

6        A.    Okay.

7        Q.    Al did not tell you you cannot

8    leave, did he?

9        A.    Yes.    He told me if I leave, I would

10   be arrested.

11       Q.    Did he use the words, "you cannot

12   leave"?

13       A.    I don't know if those words exactly

14   came out of his mouth or not.

15       Q.    No.    The only words you remember

16   are, "If you leave, we're going to turn this

17   over to the police"?

18       A.    Yes, sir.    And that is a threat that

19   says to me that I cannot leave, because if I

20   leave I risk persecution.    That is a threat.

21       Q.    Got you.    Go ahead.

22       A.    At this time --

23       Q.    So Al says, "If you leave, you'll be

24   arrested," then you say what?

25       A.    At that time, you know, I told Al,

Charles K. McKinley

March 27, 2006

Page 105

1    I said, "You know, whatever.  I'm calling my

2    lawyer."  So I picked up the phone.  He let's

3    me pick up the phone.  You know, he doesn't

4    want me to pick it up, but he let's me pick it

5    up, and I call Gene Randolph.

6        Q.    Now, is that the first time you

7    tried to pick up the phone?

8        A.    No, it is not the first time I've

9    tried to pick up the phone.

10       Q.    You didn't describe that earlier.

11   When did that occur?

12       A.    I believe that every time I told him

13   I was going to call my lawyer was an attempt

14   to pick up that phone.

15       Q.    Did you ever physically try to pick

16   up the phone before this?

17       A.    No.

18       Q.    So this was the first time you

19   reached out for the phone?

20       A.    This is the first time I reached out

21   for the phone, and I picked it up.  I had been

22   fumbling with my cell phone the whole time in

23   my hand.

24       Q.    So you had a cell phone with you as

25   well?

Charles K. McKinley

March 27, 2006

Page 106

```
 1        A.    I had a cell phone with me.

 2        Q.    Okay.  When you say you picked up a

 3   phone, do you mean the phone that was on the

 4   desk?

 5        A.    That is correct.  Because I had my

 6   cell phone in my hand, and every time, you

 7   know, I said, "I'm going to call my lawyer,"

 8   he would either to me say, "There's no reason

 9   to call a lawyer."  He would always try to

10   tell me that there's no reason to call a

11   lawyer or, "This needs to go no further than

12   right here.  You just need to sign this piece

13   of paper saying that you stole this dog food

14   and it will all be over with.  We'll let you

15   go and go about your merry way."

16        Q.    Now, when you picked up the phone

17   that was on the desk, what did Al and Kelli

18   do?

19        A.    They just sat there and looked at

20   me.

21        Q.    Did they leave the office?

22        A.    No.  I don't think he left the

23   office at that point.

24        Q.    Did you dial the number?

25        A.    Yes.
```

Charles K. McKinley

March 27, 2006

1      Q.    And they continued to sit in the

2    office?

3      A.    Yes.

4      Q.    Who is Gene Randolph?

5      A.    Gene Randolph is the gentleman that

6    I lived with --

7      Q.    He's not your lawyer?

8      A.    No.

9      Q.    Okay.

10     A.    Because I had to get the phone

11   number to my lawyer.

12     Q.    Oh, you were calling Gene to get the

13   lawyer's phone number?

14     A.    That is correct.

15     Q.    Who was your lawyer?

16     A.    Harding & Claunch.

17     Q.    How did you know Harding & Claunch?

18     A.    Because they were friends of Gene.

19     Q.    Had you socialized with them?

20     A.    Yes, I have.

21     Q.    Okay.  Had they ever represented you

22   before?

23     A.    No.

24     Q.    So you picked up the phone and you

25   dialed Gene Randolph, correct?

Charles K. McKinley

March 27, 2006

```
 1        A.    Yes.

 2        Q.    Did you dial him at home or the

 3   office?

 4        A.    I dialed him on his cell phone.

 5        Q.    Okay.  Did you get him?

 6        A.    No.

 7        Q.    Did it just go to message?

 8        A.    Yes.

 9        Q.    Did you leave a message?

10        A.    No.

11        Q.    So what happened next?

12        A.    At this time Al repeats, "There's no

13   need to take this any further to call a

14   lawyer."

15        Q.    What did you say?

16        A.    I told him that I didn't care, I was

17   calling somebody.  So next I call Catherine

18   Randolph.

19        Q.    Who is Catherine Randolph?

20        A.    Gene's wife.

21        Q.    What number -- did you call her cell

22   phone also?

23        A.    Cell phone.

24        Q.    And did you know these numbers or

25   did you have to look on your cell phone for
```

Charles K. McKinley

March 27, 2006

1     the numbers?

2          A.    I pretty much knew them.  I think I

3     just dialed them right off.

4          Q.    Because you were living there?

5          A.    Yes.

6          Q.    Did you reach Catherine Randolph?

7          A.    No.

8          Q.    Did her voice mail pick up?

9          A.    Yes.

10         Q.    Did you leave a message?

11         A.    I told her to call me.  I told her I

12    didn't have time to explain, just to call me.

13         Q.    So what happens next?

14         A.    I call Lisa Randolph, or Lisa

15    Freeman.

16         Q.    Is she married now?  Is that --

17         A.    No.  She was married to their son.

18         Q.    And did you reach her?

19         A.    Yes.

20         Q.    Did you call her cell phone?

21         A.    Yes.

22         Q.    Tell me about that conversation.

23         A.    I told her that I didn't have a lot

24    of time to explain, but basically that

25    Petsmart was trying to get me to sign some

Charles K. McKinley

March 27, 2006

1    paperwork that said that I stole merchandise

2    from the store, and that if I didn't sign it

3    they were going to call the cops and have me

4    arrested.  All the time crying.  I said that I

5    needed to get in touch with Gene.  And she

6    said that Gene was with Cathy.  She would get

7    ahold of him and kept me on the phone until

8    Gene called my cell phone.

9         Q.   Okay.

10        A.   So at that time I let her go.  I

11   talked to Gene, I told Gene exactly what was

12   going on.  I told him that I'd gotten called

13   into the office by Kelli and Al, that I was

14   being interrogated, and that I was told that

15   if I tried to leave they would have me

16   arrested, and that if I don't sign this piece

17   of paper I'll be arrested, that I did not need

18   to make any phone calls, that this needed to

19   go no further than --

20        Q.   You went through all that with Gene?

21        A.   Yes, I went through all that with

22   Gene.  I told Gene, "I need the lawyer's

23   number."

24             He said, "No, you don't call the

25   lawyer.  I'll call the lawyer."  So Gene was

Charles K. McKinley

March 27, 2006

Page 112

1      A.    Uh-huh.

2      Q.    Who's in the office with you?

3      A.    Al and Kelli.

4      Q.    Okay.  And so they can only hear

5   your words on the call, right?

6      A.    That's correct.

7      Q.    So who says the first thing after

8   you hang up with Gene?

9      A.    I hang up with Gene, and I believe

10   it was Al that, you know, continues to try to

11   tell me that I need to sign this piece of

12   paper.

13      Q.    Tell me what he says.

14      A.    He says, you know, "It will be

15   better off if you sign this paperwork, you

16   know, and just tell us what you stole."

17      Q.    Have you filled in the rest of --

18      A.    I've not --

19      Q.    -- page 1 of Exhibit 1 yet?

20      A.    I couldn't tell you whether -- I

21   know that I started work on it.

22      Q.    Flip over to the second page of

23   Exhibit 1.  Can you read those words for me?

24      A.    It says, "I Charles McKinley admit

25   to coming into the building after hours."

March 27, 2006

Page 113

1     Q.    Okay.  Now, when did you write that?

2     A.    That was after, a little bit further

3  on down the line.

4     Q.    Okay.  So you're in the office with

5  Al and Kelli, you've hung up from Gene

6  Randolph, and Al says to you what?

7     A.    He says, you know, he continues to

8  try to ask me, you know, what other

9  merchandise have I stolen from the store.  I

10  told him I hadn't stolen any merchandise.  He

11  asks me, you know, have I stolen, you know,

12  more than one bag of dog food, or, you know,

13  have I stolen one bag.  I said, "Al, I've not

14  stolen any merchandise out of the store."

15         And in between all of these, you

16  know, Al saying, "I've got a picture of you

17  taking it."

18         Me saying, "No, you don't."  I

19  basically told him if he would show me the

20  pictures, I would, you know, say I did it,

21  just so I could see the pictures, because I

22  knew there were no pictures.

23     Q.    All right.

24     A.    So this went on.  And, you know,

25  back up just a second.  As I stated earlier,

1    you know, he had already said, you know,

2    "Well, you're already fired."

3        Q.    When did he say that?

4        A.    A couple of statements ago.   I

5    believe it was, you know, about the time I was

6    getting ready to call my lawyer, and I wanted

7    to leave, because I was getting ready to just

8    walk out of the door.   And he says, "No," you

9    know, because he said, "If you walk out this

10   door, you know, and you leave this building,

11   you know, we'll have you arrested."

12       Q.    So you had about reached your point

13   and you were ready to walk out?

14       A.    Exactly.

15       Q.    And when did he say, "You're already

16   fired," was that before you picked up the

17   phone on the desk or in between all of this?

18       A.    To the best of my knowledge it was

19   before I picked up that phone he had stated to

20   me that, "You're already fired.   We've got

21   pictures of you stealing dog food.   The best

22   thing you can do for yourself at this point is

23   to sign this piece of paper and fill it out

24   and state that you stole this merchandise."

25       Q.    Okay.   So what happens next?

Charles K. McKinley

March 27, 2006

1    this any further."

2            Then Gene comes, you know, Gene

3    says, you know --

4        Q.    Well, before we get to Gene, did you

5    talk to anybody else?

6        A.    No.

7        Q.    So the last person you talked to on

8    the phone is --

9        A.    Gene.

10       Q.    -- Gene, who said, "I'll call the

11   lawyer"?

12       A.    Yes.

13       Q.    So 15 minutes later Gene shows up at

14   the store?

15       A.    Uh-huh.

16       Q.    Who is with him?

17       A.    It is Cathy and Lisa.

18       Q.    Cathy is his wife, Lisa is the woman

19   you dated?

20       A.    No.  Lisa is --

21       Q.    The sister-in-law?

22       A.    -- the sister-in-law.  And then

23   Finley walks in.  She doesn't come in

24   initially because she's crying.  Because even

25   though we're broken up, she doesn't like what

Charles K. McKinley

March 27, 2006

Page 117

1    they're doing to me.

2         Q.    All right.  You're in the office,

3    they walk into the store, where are you when

4    you first see them?

5         A.    I'm in the office.

6         Q.    Who's in the office with you?

7         A.    Kelli and Al.

8         Q.    All right.  So what happens?

9         A.    So --

10        Q.    Who speaks first?

11        A.    Gene at this point speaks first.

12        Q.    What does Gene say?

13        A.    Gene asks, "What's going on?"

14        Q.    Who answers?

15        A.    Al answers.

16        Q.    What does Al say?

17        A.    Al says that, you know, "He's in

18   here because he's entered the store at several

19   times.  He's admitted to entering the store

20   several times.  He's stolen merchandise from

21   the store."

22             And at that point Gene stops and

23   says, "Whoa."

24        Q.    You're sure that Al said you had

25   stolen merchandise?

Charles K. McKinley

March 27, 2006

Page 118

1      A.    Yes.

2      Q.    Okay.

3      A.    And at that point, Gene looks at me

4  and says, you know, I guess kind of shushes,

5  you know, Al up, because Gene -- they wouldn't

6  let -- when Gene walked in the store, the

7  employees and I guess the other managers

8  basically said, "He's in the office.  You

9  can't go in there."  Gene opened the door

10 anyway and pushed the door open.

11     Q.    Well, you don't know any of that?

12     A.    Yes, I do.  I was sitting right in

13 front of the door.  He pushed the door open.

14     Q.    Well, you couldn't hear what other

15 employees said to him?

16     A.    No.  I can only go by the

17 testimony --

18     Q.    Let's stick to what you heard and

19 saw.

20     A.    Okay.

21     Q.    So Gene comes to the door?

22     A.    And pushes the door open.

23     Q.    Pushes the door open.  How does he

24 push the door open?

25     A.    He pushes on the handle and pushes

Charles K. McKinley

March 27, 2006

1   he basically to the effect said that, and I'm

2   saying basically to the effect because I don't

3   know the exact words that come out of his

4   mouth, said that I'd been in the store, that

5   I'd stolen merchandise from the store.

6         And I told Al that he didn't have

7   any pictures.  Because at this time I'm

8   fighting mad, you know, because I'm being held

9   against my will, told if I don't, you know, if

10  I try to leave, I'm going to be arrested.

11        He's saying that they've got

12  pictures of me.  And Gene shushes Al up and

13  says, you know, "Let me ask the boy," that was

14  his words, "let me ask the boy did he steal

15  anything from your store."  Gene looked at me

16  right dead in the face and he said, "Chuckie

17  or Charles, I've known you many years.  I've

18  never known you to do anything before, but I'm

19  telling you right now you'd better be honest

20  with me."  He said, "Did you ever steal any

21  dog food out of the store?"

22        And I said, "No, Gene, I've never

23  taken any dog food out of the store."

24        And then it goes back to Al -- or

25  Gene.

Charles K. McKinley

March 27, 2006

1    Q.   Excuse me.

2    A.   Go ahead.

3    Q.   Isn't it true that you said, "I've

4 never taken anything to my knowledge"?

5    A.   To my knowledge, that's correct.

6    Q.   And Gene got mad at you for saying

7 that?

8    A.   Exactly.  Gene got mad at me for

9 saying, "To my knowledge."

10    Q.   And Gene said, "What is to my

11 knowledge mean, either you did or you didn't?"

12    A.   Yes.  And I said, "No, I didn't."

13    Q.   Okay.  Then Al said what?

14    A.   And then Al -- Gene then said to Al,

15 "The boy says he didn't steal anything, you

16 know, you're saying he did."  And Gene asked

17 Al, he said, "Exactly how much dog food are

18 you saying that he took?"  That's what he

19 said, he said, "Exactly how much dog food are

20 you saying that he took?"

21       Al says to Gene, "Why don't you ask

22 Charles?"

23       Gene says, "No, I'm not asking

24 Charles.  I'm asking you, how much did he

25 take, was it a bag, was it a pallet, was it a

Charles K. McKinley

March 27, 2006

Page 125

```
 1   soon.

 2             About this time, you know, this

 3   whole time I'm in tears.  I'm frustrated.  I'm

 4   fighting mad.  You know, I try to keep my

 5   composure the best I can, because I'm being

 6   told if I leave I'm getting arrested.

 7        Q.   What happens next?

 8        A.   Okay.  So the next thing that

 9   happens is Thomas Claunch, which is a lawyer,

10   gets on the phone, and --

11        Q.   What phone?

12        A.   My cell phone.  Well, actually

13   Gene's cell phone.

14        Q.   So Gene's cell phone rings?

15        A.   Yes.

16        Q.   Who's holding Gene's cell phone?

17        A.   Gene is holding his cell phone.

18        Q.   So he answers his own cell phone?

19        A.   That's correct.

20        Q.   How do you know who's on the other

21   end?

22        A.   Because I can hear Gene talking to

23   the lawyer, and the words come out of Gene's

24   mouth, "Well, hold on, hold on, let me let

25   you," or, "Let me let Charles tell you what's
```

Charles K. McKinley                                                          March 27, 2006

1    going on and what's happened."

2            So about this time, you know, I'm

3    still crying, Thomas gets on the phone, I'm

4    talking to Thomas, I'm explaining to Thomas

5    what they want me to do and all this stuff.

6        Q.    And everybody is still in the

7    office?

8        A.    Everybody is still in the office.

9        Q.    Al is still there?

10       A.    Yes.

11       Q.    Kelli is still there?

12       A.    Yes.

13       Q.    You're there, Gene is there?

14       A.    Yes.  At this point, when Thomas is

15   on the phone with me, Al picks up his cell

16   phone, fumbles around for a minute, looks up a

17   number out of a pad that he had in front of

18   him, and calls somebody on the phone.

19       Q.    And doesn't he go out of the office

20   to make his phone call?

21       A.    Not at that point, no.  When he's,

22   when he has that piece of paper, that pad,

23   he's fumbling through it.  He spends probably

24   about a minute in that office before I walk

25   out of the door.  You know, I've had enough, I

Charles K. McKinley

March 27, 2006

1    walk out of the door.  Because at this point

2    I'm crying.  Al walks out behind me.  I know,

3    that -- well, I don't know.  But I know that

4    Al is talking to someone in the effect of a

5    Loss Prevention Department, because I heard

6    the guy's name come out of his mouth.

7             So I walk out of the office in

8    tears.  I look around, everybody is looking at

9    me like I'm a moron.

10    Q.    You're still talking on the phone?

11    A.    I'm still talking on the phone.

12    Thomas says, "Calm down, calm down, just chill

13    out.  They're not going to do anything to you.

14    If I have to come up there myself, I'll come

15    up there myself."  He said, "Do not sign any

16    paperwork."  He said, "Do not admit to

17    anything you have not done."

18             So I go into the second office,

19    which is --

20    Q.    Where is the second office?

21    A.    (Witness indicating.)  So I walk out

22    of this office, walk down here, talking and

23    crying, walk in this office, and there's a

24    desk right here.  You know, I sit down on a

25    chair.

Charles K. McKinley

March 27, 2006

1   are coming out of his mouth, but I'm crying so

2   hard and trying to get myself under control, I

3   don't know what's going on.

4        Q.   Okay.

5        A.   So at this point Gene and Thomas,

6   I'm assuming they're having the conversation,

7   "Okay, if we need you, we'll call you."  Gene

8   hangs up the phone.  Gene comes in there and

9   Gene's standing around with me, asking me if

10  I'm okay.  And Gene again asks me, "Charles,

11  you being honest, did you take anything?"

12            I said, "Gene, you've known me a

13  long time, I've never taken any dog food out

14  of that store.  Never done it."

15            And he said, "Okay, that's all I

16  wanted to know.  As long as you're honest with

17  me, that goes a long way."

18            So at this point Al has been out

19  here talking on the phone.

20       Q.   Al has been outside of office one?

21       A.   He's been outside of office one

22  talking on the phone.  I don't know whether he

23  went to the back of the store, I mean, I was

24  in office two.

25       Q.   Okay.

Page 133

```
 1    the keys off my key ring.  And I believe at

 2    this time Kelli had walked out into the store

 3    and was standing somewhere in the vicinity of

 4    Al.  I don't know whether the keys got handed

 5    to Kelli.  I don't know whether the keys got

 6    handed to Al.  All I was told at that point,

 7    after I'd been humiliated and embarrassed in

 8    front of that whole store of employees, you

 9    know, plus all the people that were in there,

10    was to turn in my keys.  I turned in my keys,

11    I believe also my name badge, and I was told

12    to leave the store.

13         Q.   Did you leave the store --

14         A.   Yes.

15         Q.   -- at that point?

16         A.   At that point we all walked out of

17    the store.

18         Q.   Anybody say anything on the way out?

19         A.   I don't know if any employees said

20    anything.  I know that -- okay.  I know that

21    one employee, her name is Keikee, I don't know

22    if that's her short name or long name, but

23    Keikee was one of the, one of the just regular

24    sales associates, cashier girls in the store,

25    she looked at me and she said, "What's wrong?
```

Charles K. McKinley

March 27, 2006

1    police matter.  He did say the words that I

2    would be arrested.  He did say the words, you

3    know, criminal record.  He did say the word

4    jail.

5        Q.    Now, they never showed you any

6    pictures, correct?

7        A.    No.  That's correct.

8        Q.    Did they show you any time entries

9    of when you had come in?

10       A.    I believe he had something.  I never

11   put them down in front of me and looked at

12   them.

13       Q.    You weren't physically restrained in

14   the office?

15       A.    No.  They never laid their hands on

16   me.  The restraint that was there is that I

17   felt that I was backed up in a corner.  I was

18   against the door and I was threatened with the

19   verbally abusive words that said, "Don't leave

20   or you're going to be arrested."

21       Q.    I'm sorry if this is a little

22   repetitive, I just want to make sure.  There

23   was no armed guard, correct?

24       A.    That's correct.

25       Q.    You weren't locked into the office

Charles K. McKinley

March 27, 2006

Page 138

1    at any time?

2        A.    No.

3        Q.    The door remained unlocked the

4    entire time?

5        A.    I don't know if that door even has a

6    lock on it.

7        Q.    You weren't tied up in any way,

8    right?

9        A.    No.

10       Q.    No one hit you or physically coerced

11   you, right?

12       A.    No.

13       Q.    No one threatened to hit you or hurt

14   you?

15       A.    No.  They never threatened physical

16   violence, no.

17       Q.    The only time you actually stood up

18   and tried to walk out of the office is when

19   you went from office one to office two?

20       A.    That is correct.

21       Q.    And the only time you tried to pick

22   up the phone on the desk, no one tried to

23   physically stop you; is that right?

24       A.    That is correct.  It was basically,

25   we don't need to take this any further, that's

Charles K. McKinley

March 27, 2006

Page 142

1    soon as the police come, you know, I mean,

2    whose side are they going to take?  Are they

3    going to take the employee's side or are they

4    going to take a District Manager's side?  I

5    felt the call that I needed to make was not to

6    an enforcing agency, it was to my lawyer so

7    that they could protect me if something did

8    happen.

9        Q.   Now, when you did leave, no one

10    tried to stop you, right?

11       A.   That is correct.

12       Q.   When you did leave office one,

13    nobody tried to stop you?

14       A.   That is correct.  I mean, they were

15    talking, you know --

16       Q.   But you didn't have to fight your

17    way out?

18       A.   No, I did not have to fight my out.

19       Q.   Nobody else had to physically help

20    you get off the premises, right?

21       A.   That's correct.  Other than the fact

22    I was told, you know, when I left I was not

23    welcome on the property.

24       Q.   Did you ask permission to leave the

25    property?

Charles K. McKinley

March 27, 2006

```
 1        A.    I don't know if I asked permission.
 2   I think I was --
 3        Q.    Well, the answer is no, you didn't
 4   ask for permission?
 5        A.    No, I don't think I did.  I was just
 6   told to turn in my keys and my name badge or
 7   whatnot.
 8        Q.    So did Al Williams or Kelli Watson
 9   do anything differently when you did leave
10   than they'd been doing for the hour
11   beforehand?
12        A.    Not that I know of.
13        Q.    What time was it when you left?
14        A.    I don't know.  I didn't look at the
15   clock.
16        Q.    What's your best estimate?
17        A.    I don't know.  I didn't look at the
18   clock.  I would at least say I had at least
19   been in there no less than an hour, maybe an
20   hour and a half.
21        Q.    So between one hour and one and a
22   half hours in the office?
23        A.    Between one and two hours.  I
24   wouldn't say -- I don't think it was two
25   hours.  I think it was probably one and a half
```

Charles K. McKinley

March 27, 2006

Page 144

1    hours I was in that office.

2         Q.   And by that office, you mean office

3    one?

4         A.   That is correct.

5         Q.   How long did you spend in office

6    two?

7         A.   I was probably in there 15 minutes.

8    From the time I walked out of office one to

9    the time I was asked to hand in my keys and,

10   you know, anything I had, was probably equal

11   or less than 20 minutes.

12        Q.   Now, you could have left before you

13   talked to the lawyer, right, if you had

14   decided to?

15        A.   If I wanted to be arrested, yes.

16        Q.   You could have left before Gene

17   showed up?

18        A.   If I wanted to be arrested, yes.

19        Q.   Okay.  And the only thing that was

20   keeping you there was the threat that they

21   would prosecute you; is that right?

22        A.   That is correct.  And the demeanor

23   of his voice.  I mean, Al had never showed any

24   physical violence toward me.

25        Q.   What do you mean the demeanor of his

Charles K. McKinley

March 27, 2006

Page 147

1    2004; is that right?

2         A.    Yes.

3         Q.    Okay.   The law suit was filed on

4    May 6, 2005?

5         A.    Uh-huh.

6         Q.    Why did you wait that long to sue?

7         A.    Because at the present time I didn't

8    have the money.  I knew I'd been wronged.  I

9    knew that these people had personally

10   assassinated my character.  I knew that I'd

11   gone to at least one job interview that I

12   knew, that I felt without a doubt that bad

13   information had been, you know, told to me.  I

14   knew that other applications that I filled

15   out, among several applications that I filled

16   out I had no response to.  I knew that when I

17   walked into -- when I consulted with the

18   lawyers and I asked them, I said, "Is it

19   okay," I said, "My dog goes to the vet there,

20   is it okay to take my dog to the vet?"

21             They said, "That's fine.  Don't say

22   anything to anybody."

23             So I knew that when I walked into

24   that store and employees looked at me and

25   said, "They say that you were fired for

1    stealing dog food, is it true?"

2         And I said, "I can't discuss that

3    with you," because at that point I was

4    considering a lawsuit.

5         When I'm out at a mall doing a job

6    application at a store and another employee

7    comes up to me and says, "Hey, you know, what

8    went on back there?  I heard that you were

9    fired for stealing dog food, is it true?"

10   There's more than two or three people, you

11   know, on different occasions where groups of

12   people or individual people, you know, said,

13   "I heard you were fired for stealing dog

14   food," out in the public, not in the store,

15   out in the public.

16        That means to me that somebody --

17   there were only three people that were in that

18   room that knew anybody in that store, Kelli,

19   me, and Al.  I knew that my lawyers told me

20   not to say one word from the time I left that

21   store.  And I kept my mouth shut.  You know,

22   so whether somebody overheard it -- nobody

23   else knew that I was accused of stealing dog

24   food.  You know, I felt that maybe somebody

25   had run their mouth to somebody else and told

Charles K. McKinley

March 27, 2006

1    you that Al Williams said something

2    defamatory?

3         A.    Can you repeat the question?

4              MR. BENSON:  Can you read it back.

5         (Whereupon, the record was read by the

6         Reporter as requested.)

7              THE WITNESS:  No.

8         Q.    (By Mr. Benson) Your opinion that

9    they're responsible for the defamation is,

10   you've heard that there were rumors and you

11   think the rumors started with them?

12        A.    Yes, sir.  There were only three

13   people in the room.

14        Q.    Now, when you walked out of the

15   room, though, you said multiple people saw you

16   turn in your keys and your name plate,

17   correct?

18        A.    That's correct.  Multiple people saw

19   me turn in my keys and name plate.  But at

20   that time nothing was ever said about why I

21   was turning in my keys and my name plate.

22        Q.    Did anybody at Petsmart ever tell

23   you that you were fired for stealing?

24        A.    Yes.

25        Q.    Who?

Charles K. McKinley

March 27, 2006

Page 152

1      A.    The girls back in the salon.    I

2  don't know their names.

3      Q.    When was that?

4      A.    That was when I had taken my

5  Dalmation, Jack, in to Banfield to the pet

6  hospital, which is in the Petsmart store on

7  the advice that I could do so from my lawyer.

8      Q.    And the girl said to you what?

9      A.    The girls that were back there said,

10 "It's rumored that you were fired for stealing

11 dog food, is it true?"

12          And I told them, "I can't talk about

13 it."

14     Q.    But they didn't tell you where they

15 had heard the rumor from?

16     A.    No.

17     Q.    And --

18     A.    But that dog food could --

19     Q.    You can't remember the names --

20     A.    -- only come out in one place.

21     Q.    You can't remember the names of the

22 two girls, correct?

23     A.    No, sir.    There may have been two

24 girls or may have been three girls, may have

25 been two girls and a guy, I don't remember.

Charles K. McKinley

March 27, 2006

Page 153

1    Because it was about ten seconds that I was

2    in there, because one of them had signaled for

3    me to come in.

4         Q.   What were their jobs, they were

5    groomers?

6         A.   Groomers.   I'm sorry.

7         Q.   Anybody else from Petsmart ever told

8    you that there was a rumor that you had been

9    fired for stealing dog food?

10        A.   Yes.

11        Q.   Who?

12        A.   I saw Keikee out in public in the --

13        Q.   Mall?

14        A.   At the mall.

15        Q.   What did Keikee say to you?

16        A.   She said, you know, asked me how I

17   was doing.   I told her I was doing well.   I

18   was looking for a job.   And she asked me, you

19   know, why I left Petsmart.   I said, "I can't

20   tell you."

21             She said, "Well, I heard that you

22   got fired for stealing dog food, is it true?"

23             I said, "I can't talk about that."

24        Q.   Did she tell you who she had heard

25   it from?

Charles K. McKinley

March 27, 2006

Page 154

1    A.    No.

2    Q.    So you have no evidence that it came

3  from Kelli or Al, correct?

4    A.    I have no firsthand knowledge that

5  it came from Kelli or Al.

6    Q.    Well, you don't even have any

7  evidence, do you, not just firsthand

8  knowledge?

9    A.    You can say that.  I mean, I know

10  what was said, and I know that there were

11  three people in that room, and I didn't talk.

12  I was advised by my lawyers not to.

13    Q.    Anybody else besides two or three

14  people in the salon and Keikee?

15    A.    No.

16    Q.    Now, did you ever call anybody at

17  Petsmart and say "they're accusing me of

18  stealing dog food"?

19    A.    No.

20    Q.    You didn't call Dennis and say that?

21    A.    No.

22    Q.    Never had a conversation with Dennis

23  where --

24    A.    No.

25    Q.    -- where you repeated anything that

Charles K. McKinley

March 27, 2006

1     A.   Sir, I don't know what the message

2 said, sir.  I'm not going to say even possible

3 to that, because I feel that I'm kind of being

4 talked into saying something.

5     Q.   There's also a Count in the Amended

6 Complaint for intentional interference with

7 employment.  What employment are we talking

8 about?

9     A.   Petsmart.  I mean, Petco.

10     Q.   Petco.  Any other employment that

11 we're talking about?

12     A.    I feel that bad references may have

13 been on several jobs.  I mean, just because

14 there was a long stint of employment where I

15 was actively seeking employment with Petsmart

16 listed as a reference, and I never got hired

17 with anybody.

18     Q.   Okay.

19     A.   I mean, all it takes for somebody to

20 say is, no, we would never hire him again.

21     Q.   Do you know -- do you think Kelli

22 Watson interfered with your employment at

23 Petco?

24     A.   I feel that if anybody picked up the

25 phone at Petsmart it would have been Kelli,

Charles K. McKinley

March 27, 2006

Page 159

```
 1   because she was the one -- you know, as being

 2   a manager there, if somebody wanted to call

 3   and verify employment or verify anything, I'd

 4   tell them to call when Kelli was there.

 5        Q.   Do you know whether or not Kelli

 6   ever answered any of those questions or did

 7   she refer them to corporate?

 8        A.   I don't know if she referred them to

 9   corporate.  I don't know if she referred them

10   to A1.

11        Q.   Didn't you get training at some

12   point not to give out references, but to

13   ask --

14        A.   I was told not to give them out.  I

15   would just -- what I would do -- regardless of

16   what, you know, any paperwork said.  I

17   couldn't tell you if I read paperwork that

18   said everything went to corporate.  I couldn't

19   tell you if corporate had an 800 line.  But I

20   can tell you what I did was I referred

21   everybody to Kelli, because I was unsure on

22   that.

23        Q.   But you don't know one way or the

24   other whether Kelli ever gave references; is

25   that right?
```

Charles K. McKinley

March 27, 2006

Page 160

1    A.    No, sir, I don't.  I know that I

2  referred everything to her when I was a

3  manager there.

4    Q.    Do you think Al Williams interfered

5  with your employment at Petco?

6    A.    I don't know if Kelli referred them

7  to Al.  I couldn't tell you.  I know that

8  somebody, I firmly believe that somebody

9  interfered, because when a District Manager is

10  sitting there ready to hire me, and all he has

11  to say is, I've just got to check your

12  previous employment and see what they have to

13  say about you or whatnot, you know, and then

14  the next day I'm told, or two days later I'm

15  told by Joe, which was the manager at Petco at

16  the time, that, "Well, our District Manager

17  decided to pass on you."  I asked why several

18  times, he wouldn't tell me.  I felt that if

19  the guy didn't like me, he would have told

20  Joe, hey, you know, we just decided not to

21  hire him, we don't think he's a good fit.  But

22  he would not tell Joe why.

23    Q.    Well, it's possible you got a bad

24  reference out of the ambulance service, isn't

25  it?

Charles K. McKinley

March 27, 2006

Page 161

1      A.    It could be.

2            MR. BENSON:  Can we take a --

3            THE WITNESS:  Except for the fact

4      that the gentleman that terminated me or

5      mutually let me go with the ambulance

6      service had not worked for that ambulance

7      service in quite a time.

8            MR. BENSON:  Can we take a

9      five-minute break, and then I've probably

10     got just some exhibits to get in real

11     quick, and I'm done.

12           MS. HARDING:  And I'll have about

13     five minutes of follow up.  That's all.

14     (WHEREUPON, a brief recess was taken.)

15           MR. BENSON:  Let's go back on the

16     record.

17     Q.    (By Mr. Benson) Mr. McKinley, are

18     there any of your prior responses you need to

19     change or add?

20     A.    No.

21     Q.    Okay.  At one point when you were

22     describing the beginning of the conversation

23     in office one, and you said Al Williams asked

24     you what kind of dog food you buy for your

25     dog?