Service: **Get by LEXSEE®**
Citation: **2000 U.S. Dist. LEXIS 14956**

*2000 U.S. Dist. LEXIS 14956, \**

ANNIE WILLIAMS, Plaintiff, v. WAL-MART STORES, INC., Defendant.

Civ. No. 99-1032-AH-C

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF ALABAMA, SOUTHERN DIVISION

2000 U.S. Dist. LEXIS 14956

September 5, 2000, Decided
September 5, 2000, Filed

**DISPOSITION:** **[\*1]** Defendant's MOTION for summary judgment GRANTED.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant employer moved for summary judgment on the claims of plaintiff terminated employee, who asserted she was subjected to false imprisonment, defamation and the tort of outrage, arising from the incidents that resulted in her firing.

**OVERVIEW:** Plaintiff's claims arose from defendant's investigation and subsequent termination of her following an incident in which she was alleged to have underpaid for merchandise at the store. Plaintiff alleged she was held against her will in an office and that defendant's officer threatened to call the police, and finally terminated her employment. In considering summary judgment, the court found that plaintiff put forth no evidence upon which the court could find that there is an issue of any use of force, actual or implied. Plaintiff's conclusory statement that store employees were informed about her firing ahead of time failed to provide the necessary proof to show that defendant had defamed her.

**OUTCOME:** Defendant's motion for summary judgment was granted because the actions of defendant in confronting plaintiff did not amount to any use of force, actual or implied, and other employees did not allow an unauthorized publication of alleged defamation. Plaintiff was deemed to have admitted she had no claim for outrage.

**CORE TERMS:** summary judgment, defamation, prevention, manager, false imprisonment, genuine issue, movant, nonmoving party, false statement, implied threat, come forward, third party, merchandise, supervisor, outrage, arrest, female, rung, admissible evidence, material fact, matter of law, moving party, justifiable, detention, nonmovant, quotation, deprived, deposition testimony, defamatory statement, cash register

### LexisNexis(R) Headnotes ♦ Hide Headnotes

Civil Procedure > Summary Judgment > Summary Judgment Standard 🔳

*HN1*±See Fed. R. Civ. P. 56(c).

Civil Procedure > Summary Judgment > Summary Judgment Standard 🔳

*HN2* A factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing substantive law.  More Like This Headnote

Civil Procedure > Summary Judgment > Summary Judgment Standard

*HN3* The basic issue before a court on a motion for summary judgment is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.  More Like This Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof

*HN4* The moving party has the burden of showing the absence of a genuine issue as to any material fact. In deciding whether the movant has met this burden, a court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party. If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment.  More Like This Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof

*HN5* Once the movant satisfies their initial burden under Fed. R. Civ. P. 56(c) of demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmovant to come forward with specific facts showing that there is a genuine issue for trial. A party opposing summary judgment must demonstrate that there is indeed a material issue of fact that precludes summary judgment. A mere scintilla of evidence supporting the nonmoving party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party.  More Like This Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof

*HN6* A party opposing summary judgment may avail itself of all facts and justifiable inferences in the record taken as a whole. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.  More Like This Headnote

Torts > Intentional Torts > False Imprisonment

*HN7* See Ala. Code § 6-5-170 (1975). *Shepardize: Restrict By Headnote*

Torts > Intentional Torts > False Imprisonment

*HN8* For there to be a false imprisonment, there must be some direct restraint of the person; however, it is not necessary that there be confinement in a jail or a prison. Any exercise of force, or the express or implied threat of force, by which in fact the other person is deprived of his liberty, compelled to remain where he does not wish to remain, or to go where he does not wish to go, is an imprisonment.  More Like This Headnote | *Shepardize: Restrict By Headnote*

Torts > Intentional Torts > False Imprisonment

HN9⬧ It is well settled that liability for false imprisonment, like liability for malicious prosecution, cannot be predicated merely on a person's good faith act of giving information to a police officer tending to show that a crime has been committed or on a person's good faith act of identifying one suspected of a crime, for such involvement in another's detention or arrest is not regarded in the law as an instigation of or participation in the detention or arrest. More Like This Headnote

Torts > Defamation & Invasion of Privacy > Defamation Actions 🔖

HN10⬧ The elements of a cause of action for defamation in Alabama are: (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication of that statement to a third party; (3) fault amounting at least to negligence; and (4) either actionability of the statement irrespective of special harm or the existence of special harm cased by the publication of the statement. More Like This Headnote

Civil Procedure > Summary Judgment > Supporting Papers & Affidavits 🔖

HN11⬧ See U.S. Dist. Ct., S.D. Ala., R. 7.2.


**COUNSEL:** For ANNIE WILLIAMS, plaintiff: John W. Parker, Esq., Mobile, AL.

For WAL-MART STORES, INC, defendant: Craig Whitfield Goolsby, Esq., Caroline Thomason Pryor, Carr, Allison, Pugh, Howard, Oliver & Sisson, P.C., Daphne, AL.

**JUDGES:** Alex T. Howard, Jr., SENIOR UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Alex T. Howard, Jr.

**OPINION: ORDER**

This matter is before the Court on Defendant's motion for summary judgment. (Doc. 11). After considering the motion, supporting briefs, evidence on file, and applicable law, the Court finds that the Defendant's motion for summary judgment is due to be **GRANTED.**

## I. Facts

Plaintiff Annie Williams sued her former employer, Defendant Wal-Mart Stores, Inc., asserting three causes of action under Alabama state law: false imprisonment, defamation and the tort of outrage. Each of Plaintiff's claims arise from Wal-Mart's investigation and subsequent termination of Plaintiff following an incident in which Plaintiff was alleged to have underpaid for merchandise purchased in the early morning hours of September 16, 1999.

Plaintiff was employed as a 'zoner' at the Schillingers Road Wal-Mart, Store # **[*2]** 853, in Mobile, Alabama, beginning in March of 1999. As a zoner, Plaintiff was directed to ensure that items throughout the store were displayed in their proper locations and format.

Plaintiff was working the night shift on September 16. At approximately 1:45 A.M. that day, during a work break, Plaintiff took a variety of items to a cash register operated by another Wal-Mart employee, Tina Stallworth. Plaintiff proceeded to pay for the items after they had been rung up. The receipt from the transaction demonstrates that several items were voided off, or removed from the transaction, after they had been rung up.

One of the store's assistant managers, Marilyn Evans, was near the cash register operated by

Get a Document - by Citation - 2000 U.S. Dist. LEXIS 14956    Page 4 of 8

Case 2:05-cv-00562-MEF-CSC    Document 36-11    Filed 04/18/2006    Page 4 of 46

Ms. Stallworth at the time the transaction occurred. Ms. Evans asked to see the receipt. Ms. Evans became suspicious after noting that the voided items had been subsequently rung up at a price different from their original price. Shortly thereafter, Ms. Evans discussed the transaction individually with Plaintiff and Ms. Stallworth. Ms. Evans then decided to submit the incident to the Wal-Mart loss prevention department for determination.

Plaintiff returned to work beginning the following **[*3]** Saturday, and continued to work until Wednesday, September 23. Plaintiff claims she was approached by several co-employees during these shifts, and was told by them that they thought plaintiff had been fired for larceny. Plaintiff also alleges that these individuals told her that they had been told this information by assistant manager Evans. In her deposition testimony, Plaintiff was unable to identify any of these individuals by their first or last name.

Plaintiff did refer to an employee named 'Amanda,' and claimed that 'Amanda' had told Plaintiff that she thought Plaintiff had been fired. Plaintiff did not assert, however, that 'Amanda' had heard the allegedly defamatory statement from any of the Wal-Mart individuals present in Plaintiff's termination meeting, or that 'Amanda' had been told the statement by any Wal-Mart supervisor.

On September 23, 1999, Plaintiff was called into the manager's office at the back of the store to speak with Jason Williams, Wal-Mart's district loss prevention officer. Also present at the meeting were Marilyn Evans and Peggy Black. Ms. Black was present as one of the Plaintiff's supervisors and assistant managers of store # 853.

During the meeting, **[*4]** which lasted less than one hour, Plaintiff discussed the incident with the above named individuals, denying any wrongdoing. Although the accounts of the parties differ as to precisely what was said, it is undisputed that Plaintiff never asked nor attempted to leave the meeting. It is also undisputed that Plaintiff was never told by any Wal-Mart employee that she could not leave the meeting. At one point, an employee attempted to enter the room on unrelated business, but was immediately told to leave. In addition, there is some evidence that Wal-Mart's loss prevention officer threatened to call the local police, however, he did not do so.

At the end of the meeting, Plaintiff signed a written statement indicating that she had been involuntarily terminated, and was told she had 5 minutes to exit from Wal-Mart property. Plaintiff left at that time, and found employment that same day at a different retail store nearby.

## II. Summary Judgment Standard

*HN1* Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted: "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no **[*5]** genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "*HN2* A factual dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is 'material' if it might affect the outcome of the suit under the governing substantive law." Beck v. Somerset Technologies, Inc., 882 F.2d 993, 996 (5th Cir. 1989) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)); accord Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992).

*HN3* The basic issue before the Court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." See Anderson, 477 U.S. at 251-252. *HN4* The moving party has the burden of showing the absence of a genuine issue as to

any material fact, and in deciding whether the movant has met this burden the Court must view the movant's evidence and all factual inferences arising from it in the light **[*6]** most favorable to the nonmoving party. *See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970); see also Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993)*. "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992)* (citing *Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir. 1985)*).

*HN5*☞Once the movant satisfies their initial burden under Rule 56(c) of demonstrating the absence of a genuine issue of material fact, as the movant has done in this case, the burden shifts to the nonmovant to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)* (quoting *Fed. R. Civ. P. 56(e)*). Otherwise stated, the nonmovant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." *See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991)*. **[*7]** "A mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990)* (citation omitted). "*HN6*☞The nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." *Tipton, 965 F.2d at 998* (citing *United States v. Diebold, Inc., 369 U.S. 654, 655, 8 L. Ed. 2d 176, 82 S. Ct. 993 (1962)*). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tipton, 965 F.2d at 999* (quoting *Anderson, 477 U.S. at 255*). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita, 475 U.S. at 587* (internal quotation and citation omitted).

### III. False Imprisonment

Plaintiff claims that she was subjected to false imprisonment by Defendant. The facts indicate that during Plaintiff's shift on September 23, 1999, one of Plaintiff's supervisors **[*8]** called Plaintiff to come to the manager's back office in the Wal-Mart store. Plaintiff walked to the back of the store and entered the back office. Two female assistant managers, Ms. Black and Ms. Evans, and a male Wal-Mart loss prevention officer, Mr. Williams, were waiting for Plaintiff in the office.

Plaintiff, the two assistant managers and the loss prevention officer met in the office for less than one hour. During the meeting, Plaintiff and the Wal-Mart officials discussed the charge that Plaintiff had under-paid for Wal-Mart merchandise.

Plaintiff states that during the meeting, the loss prevention officer exhibited a badge and threatened to call the police. Plaintiff states that the loss prevention officer informed Plaintiff that she could be imprisoned for stealing Wal-Mart merchandise. At one point, another Wal-Mart employee attempted to walk into the office. Plaintiff states that one of the female assistant managers obstructed the employee from entering the room.

Plaintiff states that she was upset during the meeting and wished to leave. Plaintiff states that she suffers from asthma and her condition was aggravated by the meeting. Plaintiff admits that she did not ask **[*9]** to leave, nor did she make an attempt to leave. Plaintiff alleges that the threat of arrest and impression that no one could enter the room caused her to reasonably believe that she was confined.

*HN7*☞The Alabama Code defines false imprisonment as "the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty." *Ala. Code 1975, § 6-5-170*. The Alabama Supreme Court has explained:

"*HN8* For there to be a false imprisonment, there must be some direct restraint of the person; however, it is not necessary that there be confinement in a jail or a prison. Any exercise of force, or the express or implied threat of force, by which in fact the other person is deprived of his liberty, compelled to remain where he does not wish to remain, or to go where he does not wish to go, is an imprisonment."

*Big. B, Inc. v. Cottingham*, 634 So. 2d 999, 1001 (Ala. 1993).

In the instant case, Plaintiff has come forward with no evidence upon which the Court could find that there is an issue of any use of force, actual or implied. Plaintiff admits that she did not attempt to leave or ask to leave. Plaintiff claims that she felt confined **[*10]** due to the loss prevention officer's threats to call the police, however:

"*HN9* It is well settled that liability for false imprisonment, like liability for malicious prosecution, cannot be predicated merely on a person's good faith act of giving information to a police officer tending to show that a crime has been committed or on a person's good faith act of identifying one suspected of a crime, for such involvement in another's detention or arrest is not regarded in the law as an instigation of or participation in the detention or arrest."

*Crown Central Petroleum Corp. v. Williams*, 679 So. 2d 651, 654 (Ala. 1996).

Finally, Plaintiff has alleged that the female assistant manager's act of obstructing another employee from entering the room constituted an implied threat of force in that she would not be able to leave the room. However, the deposition testimony was clear that an employee was merely restricted from entering the office. The Wal-Mart manger explained that due to the sensitive nature of the meeting, other employees were not permitted in the office. The Court cannot find that this action constituted the implied threat of use of force.

Therefore, **[*11]** due to the foregoing, the Court finds that summary judgment is due to be granted on Plaintiff's false imprisonment claim.

## IV. Defamation

*HN10* The elements of a cause of action for defamation in Alabama are:

"1) a false and defamatory statement concerning the plaintiff; 2) an unprivileged communication of that statement to a third party; 3) fault amounting at least to negligence; and 4) either actionability of the statement irrespective of special harm or the existence of special harm cased by the publication of the statement." *Drill Parts and Service Co. v. Joy Mfg.*, 619 So. 2d 1280, 1289 (Ala. 1993).

To establish actionable defamation, Plaintiff must show that Wal-Mart published a false and defamatory statement concerning Plaintiff to a third person. *See Nipper v. Variety Wholesalers, Inc., 638 So. 2d 778, 781 (Ala. 1994).* Communications between employees in the course of a company's business do not constitute publication. *See id.*

Plaintiff's entire response to Defendant's motion for summary judgment on the issue of defamation states:

> "In regard to the defamation claims, Ms. Williams has pointed out specifically that, **[*12]** in fact, store employees were informed that she was a 'thief' and had 'stolen' from Wal-Mart and that was the reason for her dismissal. Accordingly, the elements of defamation set forth in Drill, Parts & Service Company vs. Joy Manufacturing, 619 So. 2d 1280 (Ala. 1993) have clearly been met."

The quotation above is the extent of Plaintiff's offer of disputed facts on the claim of defamation by oral publication, or slander. The Court cannot find that Plaintiff's conclusory statement that "store employees were informed" provides the necessary proof to show that Wal-Mart employees allowed an unauthorized publication to a third party of a false statement about Ms. Williams. *See Walker v. Darby, supra.* While Plaintiff maintains in her deposition that Ms. Evans communicated a false statement to Wal-Mart employees, Plaintiff offers no admissible evidence to support her claim, such as the first or last names of any individual employees or third parties that might have heard Ms. Evans publish the allegedly false statement. Consequently, Plaintiff has failed to come forward with any admissible evidence establishing the publication of any allegedly false **[*13]** statements to a third party. Therefore, summary judgment is due to be granted on Plaintiff's defamation claim.

## V. Tort of Outrage

Plaintiff has failed to respond to Defendant's motion for summary judgment as to Plaintiff's claim for the tort of outrage. *HN11*Local Rule 7.2 provides that failure to respond to a motion for summary judgment "will be considered an admission that no material factual dispute exists." Consequently, the Court finds that summary judgement is due to be granted on Plaintiff's tort of outrage claim.

## VII. Conclusion

Based on the foregoing, the Court finds that Defendant's **MOTION** for summary judgment is due to be and hereby is **GRANTED.**

**DONE** this 5th day of September, 2000.

Alex T. Howard, Jr.

SENIOR UNITED STATES DISTRICT JUDGE

## JUDGMENT

This matter having come before the Court on motion for summary judgment and in

accordance with the findings of fact and conclusions of law entered this day, it is hereby **ORDERED, ADJUDGED,** and **DECREED** that Plaintiff shall have and recover nothing from Defendant and that Plaintiff's claims are due to be, and hereby are, **DISMISSED WITH PREJUDICE.**

**DONE [*14]** this 5th day of September, 2000.

Alex T. Howard, Jr.

SENIOR UNITED STATES DISTRICT JUDGE

Service: **Get by LEXSEE®**
Citation: **2000 U.S. Dist. LEXIS 14956**
View: Full
Date/Time: Tuesday, April 18, 2006 - 1:50 PM EDT

* Signal Legend:
● - Warning: Negative treatment is indicated
Ⓠ - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
❶ - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

 LexisNexis®

About LexisNexis | Terms & Conditions
Copyright © 2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Service: Get by LEXSEE®
Citation: 1998 U.S. Dist. LEXIS 5326

1998 U.S. Dist. LEXIS 5326, *

DELORIS BROWN, Plaintiff, v. INFIRMARY HOME HEALTH AGENCY, INC., Defendant.

CIVIL ACTION NO. 97-0472-RV-S

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF ALABAMA, SOUTHERN DIVISION

1998 U.S. Dist. LEXIS 5326

March 25, 1998, Decided
March 25, 1998, Filed

**DISPOSITION:** [*1] Defendant's Motion for Summary Judgment GRANTED.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant home healthcare provider sought summary judgment regarding plaintiff former employee's action that alleged violations under federal discrimination law, state law claims for outrage, wantonness, invasion of privacy, slander and breach of contract, and a claim of unidentified origin relating to Medicare and employment law violations.

**OVERVIEW:** The former employee was terminated from the home healthcare provider based on a disputed falsified timesheet. The former employee brought an action against the home healthcare provider alleging violations under federal discrimination law, state law claims for outrage, wantonness, invasion of privacy, slander and breach of contract, and a claim of unidentified origin relating to Medicare and employment law violations. The court granted summary judgment to the home healthcare provider, holding that the former employee failed to comply with the administrative filing requirements of 42 U.S.C.S. § 2000e-5 by not filing her discrimination claim within 180 days after the alleged unlawful practice occurred. The former employee failed to set forth evidence of actual malice to support her defamation claim and that all statements made in connection with her unemployment compensation claim were privileged and, therefore, could not support a claim for defamation. The court found that the former employee's invasion of privacy claim failed because the only disclosures at issue occurred during a state unemployment compensation appeal and, therefore, of legitimate public concern.

**OUTCOME:** The court granted summary judgment to the home healthcare provider in the former employee's action against it.

**CORE TERMS:** summary judgment, outrage, equitable tolling, fired, invasion of privacy, handbook, disclosure, slander, lawsuit, employee handbook, termination, wanton, deposition, defamatory, defamation claim, home health, defamation, wantonness, unnamed, aide, jury question, unemployment compensation, discrimination claim, outrageous conduct, failed to produce, factual issue, employment-at-will, discriminatory, falsifying, untimely

**LexisNexis(R) Headnotes** ♦ Hide Headnotes

Civil Procedure > Summary Judgment > Summary Judgment Standard 🔧

Get a Document - by Citation - 1998 U.S. Dist. LEXIS 5326          Page 2 of 14

Case 2:05-cv-00562-MEF-CSC     Document 36-11     Filed 04/18/2006     Page 10 of 46

*HN1* ⊥ Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). All evidence must be viewed in the light most favorable to the nonmoving party. In ruling on a motion for summary judgment, the function of the court is not to weigh the evidence and determine the truth of the matter but to determine whether there is an issue for trial. More Like This Headnote

Administrative Law > Judicial Review > Reviewability > Exhaustion of Remedies 🔍

*HN2* ⊥ 42 U.S.C.S. § 2000e-5 provides that administrative complaints to the EEOC shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred. Failure to comply with this 180-day filing requirement works to bar a plaintiff's discrimination claim in the absence of equitable tolling by the court. More Like This Headnote

Governments > Legislation > Statutes of Limitations > Tolling 🔍

*HN3* ⊥ Equitable tolling is a narrow exception to statutory filing requirements. More Like This Headnote

Torts > Defamation & Invasion of Privacy > Defamation Actions 🔍

*HN4* ⊥ To establish a prima facie case of defamation under Alabama law, a plaintiff must prove: (1) a false and defamatory statement; (2) an unprivileged communication of that statement to a third party; (3) fault amounting at least to negligence on the part of the defendant; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement. More Like This Headnote

Torts > Defamation & Invasion of Privacy > Defamation Actions 🔍

*HN5* ⊥ A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. More Like This Headnote

Evidence > Privileges > Reports Privileged by Statute 🔍

Torts > Defamation & Invasion of Privacy > Common Law Privileges 🔍

*HN6* ⊥ The source of unemployment benefit privilege can be found in the statutory language of Ala. Code § 25-14-116, which provides: All letters, reports, communications and other matters, written or oral, from employer to employee to each other, or to the director or any of his agents, representatives or employees, or to any official or board functioning under this chapter, which shall have been written, sent, delivered, or made in connection with the requirements and administration of this chapter, shall be absolutely privileged and shall not be made the subject matter or basis for any civil action for slander or libel in any court. More Like This Headnote

Torts > Defamation & Invasion of Privacy

*HN7* ⊥ Under Alabama law, an invasion of privacy claim can be brought to remedy any one of four separate wrongs, including: (1) the intrusion upon the plaintiff's physical

Get a Document - by Citation - 1998 U.S. Dist. LEXIS 5326          Page 3 of 14

Case 2:05-cv-00562-MEF-CSC     Document 36-11     Filed 04/18/2006     Page 11 of 46

solitude or seclusion; (2) publicity which violates the ordinary decencies; (3) putting the plaintiff in a false, but not necessarily defamatory, position in the public eye; and (4) the appropriation of some element of the plaintiff's personality for a commercial use. More Like This Headnote

Torts > Intentional Torts > Intentional Infliction of Emotional Distress 🖫

HN8± To prevail on a claim for outrageous conduct, a plaintiff must produce evidence which demonstrates that the defendant's conduct (1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it. More Like This Headnote

**COUNSEL:** For DELORIS BROWN, plaintiff: Ellen T. Turner, Esq., Mobile, AL.

For INFIRMARY HOME HEALTH AGENCY, INC., defendant: Celia J. Collins, Esq., Katherine P. Nelson, Mobile, AL.

For INFIRMARY HOME HEALTH AGENCY, INC., defendant: Katherine Parks Nelson, Johnstone, Adams, Bailey, Gordon & Harris, Mobile, AL.

**JUDGES:** Richard W. Vollmer, Jr., UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Richard W. Vollmer, Jr.

**OPINION: MEMORANDUM OPINION AND ORDER**

This matter comes before the court on a Motion for Summary Judgment (Doc. 16), which was filed by the defendant, Infirmary Home Health Agency, Inc. ("IHHA"). In support of its motion, the defendant has filed a supporting brief (Doc. 17) and a listing of proposed findings of fact and conclusions of law ("PFF"). In response to the defendant's motion, plaintiff filed a "Brief in Opposition to Defendant's Motion for Summary Judgment." (Doc. 21). Defendant has since filed a brief in reply to the plaintiff's response brief. (Doc. 23). Based on these submissions and the supporting evidentiary filings, the court finds that defendant's summary judgment motion is now ripe for consideration.

**I. OVERVIEW [*2] OF THIS LITIGATION**

This case presents a solid example of shotgun pleading, with claims under federal discrimination law, state law claims for outrage, wantonness, invasion of privacy, slander and breach of contract, and a claim of unidentified origin relating to Medicare and employment law violations. In its motion, defendant seeks summary judgment on all of these claims.

**A. Procedural History**

On April 14, 1997, plaintiff filed her original Complaint in this action in the Circuit Court of Baldwin County, Alabama. Shortly thereafter, on May 23, 1997, defendant removed this action to federal court pursuant to 28 U.S.C. § 1441(a)(1994). Ten days later, defendant filed its original Answer (Doc. 2) along with a "Motion to Dismiss or in the Alternative Motion for a More Definite Statement." (Doc. 3). On June 5, 1997, the court issued an Order (Doc. 5) on defendant's motion, wherein it denied the motion to dismiss, but granted defendant's request for a more definite statement of Counts Four and Five of plaintiff's Complaint.

In response to the court's Order, plaintiff filed her First Amended Complaint (Doc. 7), which contained a more comprehensible description of the [*3] claims asserted in Counts Four

and Five. In her First Amended Complaint, plaintiff set forth claims for discrimination, slander, invasion of privacy, outrageous conduct, wantonness, and breach of contract, as well as an unusual claim for separate alleged violations of Medicare and employment law. On July 15, 1997, defendant filed its Answer (Doc. 8) to plaintiff's First Amended Complaint.

On October 14, 1997, plaintiff filed a "Motion for Leave to Amend Complaint to Comport with the Facts of This Case." (Doc. 11). In that motion, plaintiff indicated that she had received a right to sue letter from the Equal Employment Opportunity Commission ("EEOC"), and further indicated that she wanted to amend her First Amended Complaint to reflect her receipt of that EEOC letter. Plaintiff's statement that she had just received her notice of right to sue, however, prompted the court to order plaintiff "to provide the court with a copy of her right to sue letter and any dated material that demonstrates when her administrative complaint was first filed." (Ct.'s Order of Nov. 7, 1997, Doc. 12). On November 17, 1997, plaintiff filed copies of her initial administrative complaint to the EEOC and her **[*4]** notice of right to sue. After reviewing these documents and concluding that both were untimely, n1 the court ordered the plaintiff to prepare and file a brief explaining the legal ramifications of filing a Title VII lawsuit before exhausting, or, much less, even seeking to enforce, her administrative remedies with the EEOC. Although briefs were filed on this issue, defendant filed its Motion for Summary Judgment on December 15, 1997. The defendant's motion prompted the court to withhold ruling on the issue of exhaustion of remedies in favor of addressing all of the plaintiff's claims in a comprehensive order on summary judgment. The issues raised on summary judgment have been fully briefed by both parties and the court finds that defendant's motion is now ripe for consideration.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 The EEOC Complaint had been submitted two months *after* this lawsuit was first commenced, and the Notice of Right to Sue was not issued until October 8, 1997, six months after plaintiff's initial Complaint was filed in the Circuit Court of Baldwin County.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**[*5]**

**B. Issues Now Before the Court**

Defendant's summary judgment motion attacks plaintiff's claims on a variety of grounds. First, defendant challenges the plaintiff's discrimination claims under Title VII of the Civil Rights Act of 1964 on the basis of plaintiff's failure to exhaust administrative remedies, and alternatively, on plaintiff's failure to generate genuine factual issues in support of her claims. Additionally, defendant argues that plaintiff's claims for outrage, and violations of Medicare and employment laws fail to state claims for which relief can be granted. Finally, defendant contends that plaintiff has failed to create a genuine factual issue with respect her claims for slander, invasion of privacy, breach of contract, and wantonness.

**II. PROCEDURAL BACKGROUND**

**A. Jurisdiction**

Plaintiff brought this lawsuit alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e - 2000e-17, a separate Medicare violation, and various state law claims. This court has original jurisdiction over the federal questions presented in this lawsuit pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over plaintiff's state **[*6]** law claims pursuant to 28 U.S.C. § 1367.

## B. Venue

Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(b).

## C. Standard of Review

*HN1* Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). See also Adickes v. S. H. Kress, Inc., 398 U.S. 144, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970). All evidence must be viewed in the light most favorable to the nonmoving party. Alphin v. Sears, Roebuck & Co, 940 F.2d 1497, 1500 (11th Cir. 1991); Langston v. ACT, 890 F.2d 380, 383 (11th Cir. 1989). In ruling on a motion for summary judgment, the function of the court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is an issue for trial." Anderson v. Liberty Lobby, 477 U.S. 242, 242-43, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

The standard for awarding summary judgment is the same as that for a directed verdict: "the trial judge must grant **[*7]** [the motion] if, under governing law, there can be but one reasonable conclusion as to the verdict." Morisky v. Broward County, 80 F.3d 445, 447 (11th Cir. 1996). To avoid an adverse ruling on a motion for summary judgment, "the nonmoving party must provide more than a mere scintilla of evidence." Combs v. Plantation Patterns, 106 F.3d 1519, 1526 (11th Cir. 1997). "There must be a substantial conflict in evidence to support a jury question." Id. (quoting Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989)).

## III. FINDINGS OF FACT

Many of the facts pertinent to the defendant's summary judgment motion are disputed by the parties. Where discrepancies exist in the record, the court views the evidence in the light most favorable to the plaintiff.

## A. Background

The defendant, IHHA, operates in the business of home health care, providing general patient care and nursing services to its clients. The plaintiff, Deloris Brown, was employed by the defendant as a home health aide from April 16, 1996 until she was involuntarily terminated on September 30, 1996. Although, plaintiff was initially hired to work on a part-time basis, she was later given **[*8]** a full-time position.

## B. The Events Surrounding Plaintiff's Discharge

In the afternoon of September 27, 1996, plaintiff was scheduled to conduct a home visit for one of her regular patients, Iva Ballard. It is undisputed that plaintiff did visit the Ballard household on that day, however, there is some dispute as to the length of the plaintiff's visit. Ms. Ballard employed a care giver named Martha Hinman, who, defendant asserts, complained that the plaintiff prematurely left the Ballard home after only twenty minutes, without giving proper care to Ms. Ballard. n2 Defendant asserts that this complaint was made at 2:20 p.m. on September 27, 1996.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n2 The defendant has provided the court with a complaint report signed by a former IHHA supervisor which details the nature of the complaint against the plaintiff. Plaintiff disputes

that a complaint was ever made, and, therefore, disputes the validity of this report. Plaintiff, however, has not supplemented the record with any evidence to challenge the defendant's evidence relating to the complaint. Although the court refuses to make a finding as to the accuracy or truth of the Hinman complaint, the court is inclined to find that some complaint was made. Such a finding would be supported by the fact that plaintiff has failed to provide the court with any evidence to contradict the proof supplied by the defendant. See Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir. 1988) (noting that a plaintiff faced with undisputed evidence "must bring to the court's attention some affirmative indication that his version of relevant facts is not fanciful"). The court notes, however, that it is unnecessary to make a finding as to the Hinman complaint because that complaint does not in any way affect the court's ruling on defendant's motion.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[\*9]**

On Monday, September 30, 1996, plaintiff was called into her supervisor's office and confronted with the complaint. Plaintiff disputed the facts alleged in the Hinman complaint and insisted that she had performed all of the required tasks during her visit to the Ballard home. Later the same day, plaintiff was called back into her supervisor's office and asked about a time sheet that she had submitted for the Ballard home visit. That time sheet indicated that plaintiff had been at the Ballard house for a full visit, from 2:10 p.m. until 3:00 p.m. After some discussion of the inconsistencies between plaintiff's time sheet and the Hinman complaint, plaintiff was fired.

### C. Facts Relating to Plaintiff's Discrimination Claim n3

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 The court's previous discussion of plaintiff's failure to exhaust administrative remedies is hereby incorporated into these factual findings.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Plaintiff asserts that she was fired due to her racial status as an African-American, and further asserts that the defendant's alleged **[\*10]** reason for termination, falsification of time records, is mere pretext. Plaintiff also asserts that the defendant scheduled its African-American employees in a racially discriminatory manner. In support of her claims, plaintiff relies on the fact that Gail Washington, an African-American coworker, was fired three days before the plaintiff was terminated. Plaintiff also relies on the work schedules she received every week during her employment with the defendant. Plaintiff possessed this information at the time of her discharge.

### D. Plaintiff's Unemployment Compensation Appeal

During appeal proceedings before the Alabama Department of Industrial Relations ("ADIR") on plaintiff's claim for unemployment benefits, defendant's agents disclosed that plaintiff was fired for falsifying time records.

### IV. DISCUSSION

In addressing the parties' arguments on summary judgment, the court will consider each of the plaintiff's claims separately.

### A. The Discrimination Claims

In her First Amended Complaint, plaintiff alleges two different types of discriminatory conduct: (1) a claim of discriminatory scheduling, and (2) a claim of discriminatory termination. After **[*11]** comparing plaintiff's discrimination claims with the EEOC materials submitted in support of those claims, the court finds, with respect to both of these claims, that the plaintiff has failed to comply with the administrative filing requirements of 42 U.S.C. § 2000e-5.

HN2➤Section 706(e) of Title VII provides that administrative complaints to the EEOC "shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred[.]" 42 U.S.C. § 2000e-5(e). Failure to comply with this 180-day filing requirement works to bar a plaintiff's discrimination claim in the absence of equitable tolling by the court. See Ross v. Buckeye Cellulose Corp., 980 F.2d 648, 662 (finding a plaintiff's claims to be time-barred where plaintiff's EEOC complaint was untimely and where the court refused to apply equitable tolling); see also McClinton v. Alabama By-Products Corp., 743 F.2d 1483, 1485 (11th Cir. 1984) (finding that the 180-day time requirement is not a jurisdictional prerequisite that automatically bars all untimely lawsuits, but rather, that the time limit functions as a statute of limitations which can be subject to equitable tolling).

In the present case, **[*12]** plaintiff failed to file her initial complaint with the EEOC until June 13, 1997, two hundred and fifty six (256) days after the plaintiff was fired on September 30, 1996. Plaintiff acknowledges that this filing did not fall within the 180-day statutory time requirement, but insists that her claims should be allowed to proceed under the doctrine of equitable tolling. As grounds for her claim that equitable tolling should apply, plaintiff asserts that she did not become aware of the defendant's discrimination until sometime in April of 1997. The defendant, however, contends that equitable tolling should not apply because plaintiff had the information on which she presently bases her claim at or near the time she was discharged. The court notes that the resolution of this issue is quite important because, in the absence of a finding of equitable tolling, plaintiff's discrimination claims must be dismissed as untimely.

HN3➤Equitable tolling is a narrow exception to statutory filing requirements. See Young v. National Ctr. for Health Servs. Research, No. 92-1518, 1992 WL 369769, at *1 (4th Cir. Dec. 15, 1992) (finding equitable tolling to be a narrow limitations exception). The nature **[*13]** and application of equitable tolling were well-stated by the Eleventh Circuit in Justice v. United States, 6 F.3d 1474, 1479 (11th Cir. 1993):

> Whenever delay occurs in the institution or prosecution of a lawsuit, conflicting concerns arise regarding the fairness of continuing the proceedings. On the one hand, statutes of limitations protect defendants "promoting justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. . . . Moreover, the courts ought to be relieved of the burden of trying stale claims when a plaintiff has slept on his rights." On the other hand, these concerns may be outweighed when the interests of justice require that a plaintiff's rights be vindicated. Thus, courts, acting in their equitable capacity will toll statutes of limitations but "only upon finding an inequitable event that prevented plaintiff's timely action." The burden is on the plaintiff to show that equitable tolling is warranted.

> The interests of justice are most often aligned with the plaintiff when the defendant misleads her into allowing the statutory period **[*14]** to lapse, when she has no reasonable way of discovering the wrong perpetrated against her, or

when she timely files a technically defective pleading and in all other respects acts with "the proper diligence . . . which . . . statutes of limitations were intended to insure." The interests of justice side with the defendant when the plaintiff does not file her action in a timely fashion despite knowing or being in a position reasonably to know that the limitations period is running, and, of course when she fails to act with due diligence.

Id. (citations omitted). See also <u>Irwin v. Department of Veterans Affairs, 498 U.S. 89, 96, 111 S. Ct. 453, 112 L. Ed. 2d 435 (1990)</u> (describing the limited number of circumstances in which the Supreme Court has allowed equitable tolling).

After reviewing the plaintiff's averments and evidence, the court finds that equitable tolling is not appropriate in this instance. Specifically, the court finds that the information on which plaintiff primarily relies in her discrimination claims (e.g. her work schedules, and the similarly timed discharge of her coworker Gail Washington) was already in the plaintiff's possession or ken at the time of her discharge. Accordingly, the **[*15]** court finds plaintiff's discrimination claims to be time-barred. n4

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n4 Additionally, the court notes plaintiff's apparent disregard of the filing requirements under Title VII. Plaintiff instituted this lawsuit two months *before* she filed her administrative complaint with the EEOC. The court further notes that when the EEOC complaint was finally filed, nearly eight months had passed since the plaintiff's termination. Plaintiff's right to sue notice was not issued until October 8, 1997, six months after this lawsuit had been filed in the Circuit Court of Baldwin County. Based on this procedural background, the court cannot allow the plaintiff to proceed with her discrimination claims.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## B. The Defamation Claim

In her brief in opposition to summary judgment, plaintiff alleges that "the defendant's agents told Youndora Knight, Martha Hinman, a retired schoolteacher who was a client of IHHA, the Department of Industrial Relations, and other Home Health Aides that Deloris Brown was fired for falsifying **[*16]** her time records." (Pl.'s Br. in Opp., Doc. 21 at P 14). After reviewing each of these alleged disclosures along with plaintiff's evidentiary submissions, the court finds that the plaintiff has failed to present a genuine issue of material fact in support of her defamation claim.

*HN4* To establish a prima facie case of defamation under Alabama law, a plaintiff must prove: "(1) a false and defamatory statement; (2) an unprivileged communication of that statement to a third party; (3) fault amounting at least to negligence on the part of the defendant; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement." <u>McCaig v. Talladega Publ'g Co., 544 So. 2d 875, 877 (Ala. 1989).</u> In its brief on summary judgment, defendant attacks plaintiff's proof on the first two of these elements.

Defendant contends that the plaintiff has failed to satisfy the first element of her defamation claim because the alleged statements regarding falsification of time records are true. Although the defendant's contention on this point might well be appropriate when arguing to a jury, the court finds that such an argument **[*17]** is inappropriate on summary judgment. Plaintiff has asserted that she did not falsify her time records and that she was present at the Ballard household at 2:20 p.m., the time defendant claims she was reported as having left the home by Ms. Hinman. Based on this evidence, the court finds that there is a question of fact as to the truth of the alleged statements concerning the plaintiff's falsification of time reports.

Additionally, the court finds that the defendant cannot adequately challenge the defamatory nature of the alleged statements. As stated in the Restatement (Second) of Torts, *HNS*"[a] communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Restatement (Second) of Torts § 559 (1977). The alleged statements in this case are of the sort that would tend to injure the professional reputation of a health care worker such as the plaintiff. Accordingly, plaintiff has met her burden with respect to the first element of her defamation claim.

The defendant also challenges the plaintiff's proof as to publication of the alleged statement. With **[*18]** respect to this challenge, however, the court finds defendant's arguments to be well-taken. Plaintiff has alleged publication of the alleged defamatory statements to five different individuals, or sets of individuals, including: (1) home health aide Youndora Knight, (2) Ms. Ballard's care giver, Martha Hinman, (3) official personnel at the Alabama Department of Industrial Relations ("ADIR"), (4) an unnamed IHHA client, and (5) unnamed IHHA home health aides. To ensure that plaintiff's defamation claim receives proper attention, the court will separately examine the proof on each of these alleged instances of publication.

Plaintiff alleges in her First Amended Complaint that the defendant told Youndora Knight that the plaintiff was fired for falsifying time records. Plaintiff, however, has failed to provide the court with a statement or affidavit from Ms. Knight to substantiate this allegation. Indeed, the only proof of this allegation consists of the plaintiff's hearsay references at deposition, which even if admissible, would be insufficient to create a factual issue as to defamation.

In her deposition, plaintiff referred to a conversation with Youndora Knight wherein Ms. Knight **[*19]** stated that someone from "the office" told her the reason for the plaintiff's termination. (Pl.'s Dep. at 165). Plaintiff, however, repeatedly stated that she did not know who made this disclosure to Youndora Knight. (Pl.'s Dep. at 167, 184-86). Based on the hearsay nature of plaintiff's proof, and plaintiff's failure to link the alleged disclosure to the defendant, the court finds that plaintiff has failed to create a factual issue with respect to publication to Youndora Knight.

Plaintiff's proof regarding publication to Iva Ballard's care giver, Martha Hinman, is also deficient. The only proof of this publication can be found in the affidavit of former home health aide, Melissa Jackson. In that affidavit, Ms. Jackson states that "Martha Hinman, the sitter for Mrs. Ballard, told me that Deloris Brown had been fired because Ms. Brown had not stayed long at Ms. Ballard's house." (Jackson Aff. at 3). Plaintiff, however, has provided no proof relating to the source of Ms. Hinman's knowledge of the reason for plaintiff's discharge. Accordingly, the court cannot find a genuine issue regarding publication to Martha Hinman.

Although plaintiff appears to have submitted sufficient evidence **[*20]** regarding her claim of publication to ADIR personnel, that claim must fail because the publication at issue was privileged, and, therefore, nonactionable. Plaintiff's claim regarding ADIR stems from certain disclosures that were made during plaintiff's successful petition for unemployment compensation benefits. After plaintiff's claim for unemployment compensation was initially

Get a Document - by Citation - 1998 U.S. Dist. LEXIS 5326          Page 10 of 14

Case 2:05-cv-00562-MEF-CSC    Document 36-11    Filed 04/18/2006    Page 18 of 46

approved by an ADIR claims examiner, defendant filed an appeal on the ground that plaintiff was involuntarily discharged for falsifying her time records. Plaintiff contends that she was slandered by the defendant during the appeals proceedings.

In reviewing plaintiff's claim regarding the ADIR disclosures, the court notes that statements made to ADIR personnel during unemployment benefit proceedings are privileged, and may not be the basis for libel or slander actions in the absence of a showing of malice. See Cantrell v. North River Homes, Inc., 628 So. 2d 551, 554 (Ala. 1993). HN6⚓The source of this privilege can be found in the statutory language of Alabama Code section 25-14-116, which provides:

> All letters, reports, communications and other matters, written or oral, from employer to employee to **[*21]** each other, or to the director or any of his agents, representatives or employees, or to any official or board functioning under this chapter, which shall have been written, sent, delivered, or made in connection with the requirements and administration of this chapter, shall be absolutely privileged *and shall not be made the subject matter or basis for any civil action for slander or libel in any court.*

Ala. Code 25-14-116 (1975) (emphasis added). In the present case, plaintiff has failed to set forth evidence of actual malice. See Cole v. Cooper, 437 So. 2d 1257, 1258 (Ala. 1983) (noting that the plaintiff bears the burden of proving actual malice and that "where no proof of malice is offered at all, summary judgment is appropriate"). Accordingly, the court finds that all statements made in connection with plaintiff's unemployment compensation claim are privileged and, therefore, cannot support a claim for defamation.

Plaintiff's remaining allegations of publication to unnamed IHHA clients and IHHA employees cannot stand. The plaintiff has failed to produce anything other than conclusory allegations in support of these claims, n5 and, indeed, has even failed to provide **[*22]** the court with the names of these individuals. Accordingly, the court finds that all of plaintiff's defamation claims must fail on summary judgment.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 In her Brief in Opposition to Summary Judgment, plaintiff contends that the affidavit of Youndora Knight supports her allegation of defamatory communications to an unnamed IHHA client and to unnamed IHHA home health aides. (Pl.'s Br. in Opp., Doc. 21 at 15). The court notes, however, that no such affidavit was filed in this case.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## C. The Claim for Invasion of Privacy

In Count Three of her First Amended Complaint, plaintiff alleges that her privacy was violated when the defendant disclosed the grounds for her termination. This invasion of privacy claim is similar to plaintiff's slander claim insofar as the same alleged disclosures constitute the

basis of both claims. Because, as shown above, plaintiff has produced evidence only as to the disclosure to ADIR, the court will limit its analysis to that disclosure.

HN7️⃣Under Alabama law, an invasion of privacy [*23] claim can be brought to remedy any one of four separate wrongs, including:

> (1) the intrusion upon the plaintiff's physical solitude or seclusion; (2) publicity which violates the ordinary decencies; (3) putting the plaintiff in a false, but not necessarily defamatory, position in the public eye; and (4) the appropriation of some element of the plaintiff's personality for a commercial use.

Brassfield v. Jack McLendon Furniture, Inc., 953 F. Supp. 1424, 1437 (M.D. Ala. 1996) (quoting Phillips v. Smalley Maintenance Servs., 435 So. 2d 705, 708 (Ala. 1983)). In her Brief in Opposition to Summary Judgment, plaintiff has indicated that she relies on the second and third grounds for this tort: publicity which violates ordinary decency and false light invasion of privacy. (Pl.'s Br. in Opp., Doc. 21 at 18). Because the court has already found that the plaintiff has failed produce sufficient evidence of defamation, the court finds that plaintiff's false light invasion of privacy claim must also fail. Accordingly, the only invasion of privacy claim now before the court is plaintiff's allegation of publicity which violates ordinary decency, or in this case, a claim for [*24] "publication of private affairs not within the legitimate concern of the public." Hogin v. Cottingham, 533 So. 2d 525, 530 (Ala. 1988). Because the only disclosures at issue occurred during a state unemployment compensation appeal, the court must find that such disclosures were of legitimate public concern. Accordingly, plaintiff's invasion of privacy claim must fail.

## D. Outrageous Conduct

In asserting her state law claim for the tort of outrage, plaintiff points to the defendant's alleged actions involving discrimination against the plaintiff, encouraging Medicare fraud, and disclosing the grounds for plaintiffs discharge. Plaintiff contends that such actions are sufficient to support a claim for outrage under Alabama law. After reviewing the evidence in this case, however, the court finds that plaintiff's claim for outrage is inadequate to survive summary judgment.

Under Alabama law, the tort of outrage, which is more commonly known as intentional infliction of emotional distress, applies in only a narrow set of cases. As the Alabama Supreme Court has stated, "this Court has consistently held that the tort of outrage is a very limited cause of action that is [*25] available only in the most egregious circumstances. As a consequence, this Court has held in a large majority of the outrage cases reviewed that no jury question was presented." Thomas v. BSE Indus. Contractors, Inc., 624 So. 2d 1041, 1043 (Ala. 1993) (citations omitted). HN8️⃣To prevail on a claim for outrageous conduct, a plaintiff must produce evidence which demonstrates that the defendant's conduct "(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it." Wilson v. Gayfers Montgomery Fair Co., 953 F. Supp. 1415, 1423 (M.D. Ala. 1996) (quoting Barton v. American Red Cross, 829 F. Supp. 1290, 1309 (M.D. Ala. 1993)). The burden for proving a claim of outrage is so heavy that all of the cases in which the Alabama Supreme Court has found a jury question on an outrage claim can be placed into one of three narrow categories: (1) cases dealing with wrongful conduct in the context of family burials; (2) cases where insurance agents employed heavy handed, barbaric means to coerce an insured into settling

an insurance claim; and (3) cases involving egregious sexual harassment. **[*26]** See Thomas, 624 So. 2d at 1044.

In the present case, the court finds as a matter of law that the plaintiff has failed to state a claim for outrage. Although the plaintiff has alleged conduct which is inappropriate, and certainly not to be condoned, such conduct does not square with any of the three categories of outrageous conduct that are recognized as outrageous under Alabama law. Additionally, and most importantly, plaintiff has failed to allege "emotional distress so severe that no reasonable person could be expected to endure it." Indeed, in the present case, plaintiff stated at deposition that she was unaware of the alleged discriminatory basis for her discharge until six months after she was fired. While plaintiff has asserted that she was "depressed" for some of the time after she was fired, that assertion does not rise to the level of emotional distress required for a claim of outrage, especially where plaintiff claims that she did not know why she had been fired. The court will not find a jury question on plaintiff's outrage claim based on the facts presented in this case.

### E. The Claim for Violations of Medicare/Employment Laws

Plaintiff's claim for violations **[*27]** of Medicare and employment laws must fail, insofar as the plaintiff fails to identify or give notice of the cause or causes of action she is pursuing. Additionally, where the nature of plaintiff's allegations can be distilled, the court finds that plaintiff has merely duplicated claims asserted elsewhere in her First Amended Complaint.

Furthermore, the court finds that plaintiff's Medicare claim also fails for lack of standing. Although plaintiff arguably would have standing to assert a claim for Medicare abuses in a qui tam action under the False Claims Act, no such claim has been presented here.

### F. Wantonness

In Count Four of her First Amended Complaint, plaintiff alleges various acts of wanton conduct, including: wanton slander, wanton discrimination, wanton Medicare fraud, and wanton discharge of the plaintiff for false reasons. Because the court has already adequately addressed plaintiff's claims relating to discrimination n6, slander and Medicare law violations, the court finds it unnecessary to revisit the same arguments on plaintiff's duplicate claims for wantonness. Additionally, because Alabama follows the doctrine of employment-at-will, n7 the court finds **[*28]** that plaintiff has failed to state a claim in her allegation that she was discharged for a false reason.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n6 The court finds that plaintiff's wanton discrimination claim must be time barred along with plaintiff's other discrimination claims, because that wanton discrimination claim is necessarily founded on the same federal remedy under Title VII of the Civil Rights Act of 1964. This result follows from the fact that Alabama law provides no separate remedy for race or gender discrimination in employment. See Howard v. Wolff Broadcasting Corp., 611 So. 2d 307, 312-13 (Ala. 1992) (noting the lack of a gender discrimination exception to the doctrine of employment-at-will under Alabama law and also noting the judiciary's unwillingness to recognize such a public policy exception in the absence of action by the state legislature); see also Deborah M. Shelton, The Maryland Survey: 1995-1996, 56 Md. L. Rev. 825, 829 n.46 (1997) (stating that Alabama is the only state without a statute prohibiting discrimination in employment); but see 1997 Ala. Acts 97-723 (H.B. 389) (prohibiting age discrimination in employment). **[*29]**

Get a Document - by Citation - 1998 U.S. Dist. LEXIS 5326    Page 13 of 14

Case 2:05-cv-00562-MEF-CSC    Document 36-11    Filed 04/18/2006    Page 21 of 46

n7 See Culbreth v. Woodham Plumbing Co., 599 So. 2d 1120, 1121 (Ala. 1992) (stating that "under Alabama law, an employment contract is generally terminable at will by either party, with or without cause or justification -- for a good reason, a wrong reason, or no reason at all").

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## G. The Contract Claim Based on the Missing Employee Handbook

Although the exact nature of plaintiff's contract claim is unclear, the court understands that claim to allege the breach of a pre-discipline investigation provision in an employment handbook. Plaintiff appears to claim that the language of this employment handbook constitutes a contract. The court, however, has been unable to define plaintiff's claim in more discrete terms.

Plaintiff set forth her contract law claim in Count VII of her First Amended Complaint. In that Count, plaintiff asserts that:

> As a part of the terms and conditions of her employment, plaintiff was given an Employee Handbook. In this handbook, a process of investigation which is to be followed before termination of an employee is outlined. This investigation [*30] process was not followed prior to Mrs. Brown's termination, despite the fact that the terms of such an investigation are set by the defendants [sic.]. The Employee Handbook further provides guidelines for acceptable and proper behavior for employees of the defendants [sic.], violation of which could lead to termination of employment. Ms. Brown did not violate any of these guidelines.

(Pl.'s First Am. Compl., Count VII, P 1).

Although the plaintiff's claim appears to advance a contract-based exception to the doctrine of employment-at-will, the claim also appears to argue the simple breach of an investigation provision. The court's uncertainty in this regard has not been clarified by plaintiff's further submissions on summary judgment. Indeed, the ambiguity that can already be found in plaintiff's First Amended Complaint is only exacerbated by the fact that plaintiff has neglected to provide the court with any law to support her claim, and, as well, has failed to supply the employment handbook on which the claim is based. In addition to this failure to provide the employee handbook, plaintiff could not recall any of the handbook's provisions at her deposition. By providing [*31] nothing more than unclear, unsubstantiated allegations in her pleadings, plaintiff has clearly failed to create a factual issue on this claim. n8 Indeed, based on this factual record, the court questions whether plaintiff's counsel had sufficient information or belief to submit this claim.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n8 Defendant denies the existence of the alleged employee handbook, and, therefore, denies having distributed any such handbook. In contrast, the plaintiff asserts that she did receive some type of employee handbook. Although a fact question might ordinarily be presented by plaintiff's contrary assertion, plaintiff has failed to produce a handbook, and, more importantly, has failed to produce any evidence of the alleged handbook's terms. Without

Get a Document - by Citation - 1998 U.S. Dist. LEXIS 5326     Page 14 of 14

Case 2:05-cv-00562-MEF-CSC     Document 36-11     Filed 04/18/2006     Page 22 of 46

proof of the alleged handbook's terms, the court must find the plaintiff's contract based claim inadequate as a matter of law. See Mooney v. Harco Drug, Inc., 611 So. 2d 235, 238 (Ala. 1992) (rejecting an implied contract claim by former employees, where those employees failed to produce proof of specific contract terms supporting recovery); see also Davis v. University of Montevallo, 638 So. 2d 754, 756-57 (Ala. 1994) (stating the elements for the contract based exception to employment-at-will). Accordingly, any question of fact that is arguably presented in this case regarding the existence of a generic, undefined employee handbook, is rendered immaterial by plaintiff's failure to prove the terms of that handbook. See Holland v. Hanks, 1998 U.S. App. LEXIS 3934, No. 97-3660, 1998 WL 93974, *2 (7th Cir. Mar. 3, 1998) ("In opposing summary judgment, a plaintiff . . . must come forward with evidence sufficient to show an issue of fact *on each element* as to which he would bear the burden at trial." (emphasis added)); cf. Campisi v. Scoles Cadillac, Inc., 611 So. 2d 296, 300 (Ala. 1992) (finding no implied contract for employment where plaintiff could produce only a more general type of employee handbook).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - [*32]

## V. CONCLUSION

Based on the foregoing, the court concludes that defendant is entitled to summary judgment as to all of the plaintiff's claims. Accordingly, defendant's Motion for Summary Judgment is hereby **GRANTED.**

DONE this the 25 day of March, 1998.

Richard W. Vollmer, Jr.

**UNITED STATES DISTRICT JUDGE**

**JUDGMENT** - JUDGEMENT ENTERED ON DOCKET 3/26/98

**FINAL JUDGMENT** is hereby entered in favor of defendant Infirmary Home Health Agency, Inc. and against plaintiff Deloris Brown on all claims presented in the First Amended Complaint. Thus, plaintiff shall have and recover **NOTHING** from defendant. Additionally, it is hereby **ORDERED** that each party shall bear its own costs.

DONE this the 25 day of March, 1998.

Richard W. Vollmer, Jr.

**UNITED STATES DISTRICT JUDGE**

Service: **Get by LEXSEE®**
Citation: **1998 U.S. Dist. LEXIS 5326**
View: **Full**
Date/Time: Tuesday, April 18, 2006 - 1:58 PM EDT

 **LexisNexis®**     About LexisNexis | Terms & Conditions
Copyright © 2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Service: Get by LEXSEE®
Citation: 2001 U.S. Dist. LEXIS 7257

2001 U.S. Dist. LEXIS 7257, *

KAREN MARIE WATSON, Plaintiff, v. McRAE'S, INC., et al., Defendants.

CIVIL ACTION NO. 99-0980-BH-L

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF ALABAMA, SOUTHERN DIVISION

2001 U.S. Dist. LEXIS 7257

May 24, 2001, Decided
May 24, 2001, Filed

**DISPOSITION:** [*1] Defendants' motions for summary judgment (Doc. 57 and 61) GRANTED and JUDGMENT entered in favor of the defendants, McRae's, Inc., McRae's of Alabama, Inc., Jeffrey Nobles, Thomas Eitt and Floyd Smith, and against the plaintiff, Karen Marie Watson.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff former employee sued defendants, alleging that she was discharged because of her race in violation of Title VII of the Civil Rights Act of 1964. Plaintiff also asserted a number of related state-law tort claims against defendants, including malicious prosecution, abuse of process, false imprisonment, invasion of privacy, negligence, wantonness, defamation, conversion, and outrage. Defendants moved for summary judgment.

**OVERVIEW:** A $ 70,000 shortfall in plaintiff's department led to an internal investigation. Plaintiff was allegedly terminated based on video evidence which included footage of her putting money from the terminal in her pocket and her violating cash handling procedures. In plaintiff's discrimination discharge action against defendants, plaintiff claimed that she was investigated, suspended, and terminated solely because she was black. The court granted defendants' summary judgment motions. Plaintiff failed to establish that she was treated less favorably than similarly situated white employees. Even if plaintiff had established a prima facie case, her discharge claim would have failed because defendants articulated a legitimate nondiscriminatory reason for her discharge and plaintiff could not establish that the articulated reason was a pretext for intentional race discrimination. Plaintiff also failed to prove her state-law tort claims. Regarding her malicious prosecution claim, plaintiff failed to establish the essential element of lack of probable cause.

**OUTCOME:** Defendants' summary judgment motions were granted as to plaintiff's discriminatory discharge and state-law tort claims.

**CORE TERMS:** terminal, theft, pocket, customer, terminated, shortage, false imprisonment, abuse of process, arrest, prima facie case, folded, video, tape, cash sale, termination, store manager, malicious prosecution, summary judgment, probable cause, interview, issuance, voided, similarly situated, cash drawer, left hand, videotape, recorded, stealing, duty, matter of law

**LexisNexis(R) Headnotes** ♦ Hide Headnotes

Labor & Employment Law > Discrimination > Title VII

Labor & Employment Law > Discrimination > Racial Discrimination > Other Laws

*HN1* Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment because of such individual's race. 42 U.S.C.S. § 2000(e)-2(a)(1).   More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment

Civil Procedure > Summary Judgment > Burdens of Production & Proof

*HN2* By necessity, a plaintiff must make a prima facie case of discrimination to avoid summary judgment.   More Like This Headnote

Labor & Employment Law > Discrimination > Racial Discrimination > Coverage & Definitions

*HN3* Title VII of the Civil Rights Act of 1964 claims against individual defendants are not maintainable under settled Eleventh Circuit precedent which precludes Title VII claims against employee defendants.   More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment

*HN4* One method by which the plaintiff can establish a prima facie case is to show: (1) that she is a member of a protected class, (2) that she was qualified for the position held, (3) that she was terminated, and (4) that she was replaced by a person outside the protected class.   More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment

*HN5* A plaintiff may establish a prima facie case by showing: (1) she belongs to a racial minority; (2) she was subjected to adverse job action; (3) her employer treated similarly situated employees outside her classification more favorably; and (4) she was qualified to do the job. Where the evidence does not fit neatly into a classic formulation of the prima facie case, a prima facie case may also be established by proof of actions taken by the employer from which the court may infer discriminatory animus.   More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment

*HN6* It is the plaintiff's burden to establish that the comparators upon which she relies are similarly situated in all relevant respects. This analysis requires the court to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways. If the plaintiff fails to identify similarly situated, non-minority employees who were treated more favorably, her case must fail because the burden is on her to establish a prima facie case.   More Like This Headnote

Labor & Employment Law > Discrimination > Title VII

*HN7* Title VII of the Civil Rights Act of 1964 does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules.   More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 7257        Page 3 of 24

Case 2:05-cv-00562-MEF-CSC     Document 36-11     Filed 04/18/2006     Page 25 of 46

Civil Procedure > Summary Judgment > Burdens of Production & Proof 🔖

*HN8*⚓A plaintiff, when faced with a motion for summary judgment, cannot rely on attenuated possibilities that a jury would infer a discriminatory motive, but rather must come forward with sufficient evidence to establish a prima facie case and respond sufficiently to any rebuttal by the defendant to create a genuine issue of material fact. More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment

*HN9*⚓Establishing a prima facie case does not always suffice for a plaintiff to survive a motion for summary judgment. Even where a prima facie case has been established but the defendant has rebutted with a proffer of legitimate, nondiscriminatory reasons for the discharge, a genuine issue of material fact is not automatically presented. More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment

*HN10*⚓The plaintiff must show that defendant's articulated reason for discharging her was a pretext for discrimination. The plaintiff must show both that the reason was false, and that discrimination was the real reason. More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment

*HN11*⚓Once the defendants articulates a legitimate reason for the discharge, the burden shifts to the plaintiff to prove by a preponderance of the evidence that discrimination was a reason for the discharge. The plaintiff, to shoulder this burden, must introduce evidence that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence. The burden the plaintiff must satisfy is to come forward with "specific facts" evidencing intentional discrimination. Likewise, the requirement of specific facts requires a plaintiff to come forward with evidence which is "significantly probative" of intentional discrimination. More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment

*HN12*⚓In an employment discrimination case, the issue is not whether the employee was in fact guilty, but whether the decision maker had a good faith belief that she engaged in the conduct for which she was discharged. More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment

*HN13*⚓Determination of whether the decision maker had a good faith belief that the employee engaged in the conduct for which she was discharged requires consideration of the facts as they were known at the time of the decision, not what was discovered after the decision. The determination of the "credence" of the reasons must necessarily be measured at the time of a plaintiff's discharge and the goal of a court is to determine not whether defendant's reasons for discharge were in fact correct, but instead whether defendant believed them to be correct at the time of discharge. More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment

*HN14*⚓Under the "cat's paw" theory, causation may be established if the plaintiff shows that the decisionmaker followed the biased recommendations without independently

investigating the complaint against the employee. More Like This Headnote

Torts > Intentional Torts > Abuse of Process & Malicious Prosecution 

HN15± Under Alabama law, the elements of a malicious prosecution are (1) a prior judicial proceeding; (2) instigated by the defendant(s); (3) without probable cause; (4) with malice; (5) which was terminated in favor of the plaintiff; and (6) damage. To prevail in a malicious prosecution claim, a plaintiff must prove all of the elements. An action for malicious prosecution is not favored at law. More Like This Headnote

Torts > Intentional Torts > Abuse of Process & Malicious Prosecution 

HN16± Lack of probable cause is an essential element of a cause of action for malicious prosecution. Probable cause means such a state of mind of the prosecutor as would lead a man of ordinary caution and prudence to believe or entertain an honest and strong suspicion that the person arrested is guilty. More Like This Headnote

Torts > Intentional Torts > Abuse of Process & Malicious Prosecution

HN17± The malicious prosecution plaintiff has the burden of proving a negative -- i.e., the complete absence of evidence from which a reasonable jury could infer that there was probable cause from which the defendant could have instituted the suit in question. When the facts as they relate to the issue of probable cause are undisputed the question of whether the facts constitute probable cause is one of law for the court. In determining whether probable cause existed, the issue is dependant on the defendant's "subjective belief" even if that belief is subsequently shown to be incorrect. The issue is not whether the plaintiff was in fact guilty of the charge, but whether the defendant in fact saw events that would lead him to believe that she was guilty. Moreover, the existence of probable cause is to be judged in light of the facts as they appeared when the underlying action was filed. More Like This Headnote

Criminal Law & Procedure > Criminal Offenses > Property Crimes > Larceny & Theft

HN18± See Ala. Code § 13A-8-5.

Torts > Intentional Torts > Abuse of Process & Malicious Prosecution

HN19± The elements of abuse of process are: 1) the existence of an ulterior purpose, 2) a wrongful use of process, and 3) malice. The essence of the tort of abuse of process is the wrongful use of process after it has been issued. More Like This Headnote

Torts > Intentional Torts > Abuse of Process & Malicious Prosecution

HN20± The chief distinction between abuse of process and malicious prosecution is that the former rests upon the improper use of regularly issued process, whereas the latter has to do with the wrong in the issuance of the process or in causing the process to be issued. More Like This Headnote

Torts > Intentional Torts > Abuse of Process & Malicious Prosecution

HN21± Alabama law is clear that proceeding with a criminal prosecution even for an improper purpose is not sufficient to constitute abuse of process. To prove abuse of process, a plaintiff must show that the defendant somehow acted outside the

boundaries of legitimate procedure after the charge had been
filed. More Like This Headnote

Torts > Intentional Torts > False Imprisonment

HN22 In order to establish false imprisonment, the plaintiff must establish that she was
unlawfully detained and thereby deprived of her personal liberty through a direct
restraint of her person. More Like This Headnote

Torts > Intentional Torts > False Imprisonment

HN23 An arrest and imprisonment pursuant to a valid warrant cannot form the basis for a
false imprisonment claim. If the defendant complies with the formal requirements of
the law, as by swearing out a valid warrant, so that the arrest of the plaintiff is
legally authorized, the court or its officers are not his agents to make the arrest,
and their acts are those of the law and state, and not to be imputed to him. It is as
well the settled law in Alabama. If an arrest is made pursuant to a warrant issued
by a lawfully authorized person, neither the arrest nor the subsequent
imprisonment is "false," and, as a consequence, the complaining party's action must
be one for malicious prosecution. More Like This Headnote

Torts > Intentional Torts > Abuse of Process & Malicious Prosecution

Torts > Intentional Torts > False Imprisonment

HN24 Alabama law is clear that a false imprisonment claim which is based on the same
set of circumstances as a malicious prosecution claim is not maintainable. Thus,
where a false imprisonment claim is based on an arrest and prosecution, the
cognizable claim is for malicious prosecution, not false
imprisonment. More Like This Headnote

Torts > Negligence > Duty > Duty Generally

HN25 The general rule is that every person owes every other person a duty imposed by
law to be careful not to hurt him. To determine whether a duty existed, the court
should consider a number of factors, including public policy, social considerations,
and whether the injury was foreseeable to the defendant. However, the essential
question is whether the plaintiff's interests are entitled to legal protection against
the defendant's conduct. More Like This Headnote

Labor & Employment Law > Employment Relationships > At-Will Employment

HN26 The Alabama Courts have steadfastly refused to modify, even on "public policy"
grounds, the employee-at-will doctrine which provides that an employment contract
terminable at the will of either the employer or the employee may be terminated by
either party at any time with or without cause. More Like This Headnote

Labor & Employment Law > Employment Relationships > At-Will Employment

HN27 In Alabama, an employee may be terminated with or without cause or justification
which means for a good reason, a wrong reason, or no reason. More Like This Headnote

Torts > Negligence > Negligence Generally 

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 7257    Page 6 of 24

Case 2:05-cv-00562-MEF-CSC    Document 36-11    Filed 04/18/2006    Page 28 of 46

*HN28* ⚓ It is fundamental to a claim of negligent or wanton supervision that a plaintiff must establish that the underlying tortious conduct took place. More Like This Headnote

Torts > Negligence > Negligence Generally 🔖

*HN29* ⚓ The mere fact that an injury occurred is not evidence of negligence and in negligent supervision cases negligence will not be found by inference. The plaintiff is required to affirmatively show that had the master exercised due and proper diligence, the master would have learned of the servant's incompetency. More Like This Headnote

Torts > Intentional Torts > Conversion 🔖

*HN30* ⚓ Conversion is the wrongful taking of another person's property and in order to maintain a conversion claim a plaintiff must show legal title and the immediate right of possession to the property. More Like This Headnote

**COUNSEL:** For KAREN MARIE WATSON, plaintiff: Donald G. Beebe, Esq., Daryl A. Atchison, Atchison, Crosby, Saad & Beebe, P.C., Mobile, AL.

For MCRAE'S, INC., JEFFREY NOBLES, THOMAS EITT, defendants: Sandy G. Robinson, Esq., Cabaniss, Johnston, Gardner, Dumas & O'Neal, Mobile, AL.

For MCRAE'S, INC., JEFFREY NOBLES, THOMAS EITT, defendants: William K. Thomas, Esq., Cabaniss, Johnston, Gardner, Dumas & O'Neal, Birmingham, AL.

For FLOYD SMITH, defendant: Dennis Patrick McKenna, Esq., Prince, McKean, McKenna & Broughton, Mobile, AL.

For JEFFREY NOBLES, defendant: Ian David Rosenthal, Cabaniss, Johnston, Gardner, Dumas & O'Neal, Mobile, AL.

**JUDGES:** WB Hand, SENIOR DISTRICT JUDGE.

**OPINIONBY:** WB Hand

**OPINION: FINDINGS OF FACT; CONCLUSIONS OF LAW; AND ORDER**

This action is before the Court on the motions for summary judgment filed by defendant Floyd Smith (Doc. 57), individually, and by defendants McRae's, Inc. ("McRae's"), Jeffrey Nobles ("Nobles") **[*2]** and Thomas Eitt ("Eitt") (Doc. 61), jointly. In connection with the latter motion and plaintiff's response, the Court has first considered the parties' respective motions (Docs. 62 and 69) for leave to file briefs exceeding the page limitations established in the Local Rule of this Court. It is **ORDERED** that these motions be and are hereby **GRANTED**.

The plaintiff, Karen Marie Watson ("Watson"), is a former employee of McRae's who was discharged following an internal investigation of the Cosmetics and Fragrance Department of the Mobile Store in which she worked. Watson's discharge came after she was recorded on a surveillance video engaging in a number of transactions which the defendants found to be questionable. In this case, Watson claims that she was discharged because of her race in violation of Title VII of the Civil Rights Act of 1964. She has also asserted a number of related state-law tort claims against the defendants, those being for malicious prosecution, abuse of process, false imprisonment, invasion of privacy, negligence, wantonness, defamation, conversion and outrage.

The Court has considered the defendants' motions for summary judgment and evidence (Docs. 58, 59, 63 [*3] and 64), plaintiff's response in opposition thereto (Docs. 70 and 71), defendants' reply (Doc. 72), the Pretrial Order jointly prepared by the parties (Doc. 80) and all other pertinent portions of the record. n1 Based upon such consideration, the Court concludes that defendants' motions for summary judgment are due to be granted. Accordingly, the Court makes the following findings of material undisputed fact and conclusions of law:

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 The Court has also considered defendants' motion to strike portions of the affidavit testimony proffered by the plaintiff (Doc. 73). The Court concludes, for the reasons stated in the motion, that the motion is due to be and is hereby **GRANTED.**

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**FINDINGS OF FACT**

1. Defendants McRae's, Inc. and McRae's of Alabama, Inc. (collectively "McRae's") operate a retail department store at Springdale Mall in Mobile, Alabama. (PTO at AF 1). n2

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 "PTO" refers to the Pretrial Order (Doc. 80) entered in this case and "AF" refers to the parties Agreed Facts as set forth in that order.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*4]**

2. Karen Marie Watson was hired as a Sales Associate in the Mobile Store in 1987 and continued there until her employment was terminated in 1998. (PTO at AF 2). At the time of her termination, Watson was Counter Manager over the Fashion Fair line of cosmetics in McRae's Cosmetics Department. (PTO at AF 3).

3. At the time of Watson's termination, Thomas Eitt ("Eitt") was Manager and Jeffrey Nobles ("Nobles") was Loss Prevention Manager of the Mobile Store. (PTO at AF 4 and 5). Eitt and Nobles are both named defendants in this action. The Loss Prevention Department is responsible for preventing and detecting both external and internal theft. (PTO at AF 6). External theft consists of shoplifting while internal theft may be either theft of products or cash theft by associates of the store. (Mulligan dep. at 11-12).

4. Defendant Floyd Smith ("Smith") was McRae's Regional Loss Prevention Manager. His office was located at the Mobile Store but he had supervisory responsibility for loss prevention activities in a number of stores in the Region. Jeffrey Nobles reported to Smith.

5. In 1998, the Mobile Store was considered a target store for investigation by McRae's corporate headquarters **[*5]** because of its cash shortage and inventory problems, including the Cosmetic and Fragrance Department which had a $ 70,000 inventory shortage, thus making it a target department within the store itself. Plaintiff's Opposition Brief (Doc. 70) at 5. Plaintiff does not dispute that the $ 70,000 inventory shortage in her department in 1987 was unusually high as compared to a normal shortage of $ 10-15,000. (Eitt dep. at 163-65).

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 7257    Page 8 of 24

Case 2:05-cv-00562-MEF-CSC    Document 36-11    Filed 04/18/2006    Page 30 of 46

6. Because of the shortage, the Department was monitored more closely and the paperwork was audited to determine whether the abnormally high inventory shortage was due to paperwork errors. No problem was found with paperwork. (Eitt dep. at 164-65). In September 1998, the store began to notice that a particular register was popping up with a cash shortage on a regular basis. That was Register 2 in Cosmetics and Fragrance Department. The amount of the shortages were between $ 50 and more than $ 100. (Eitt dep. at 165-167). Cash shortages can be caused by a number of factors. These factors include voiding of transactions and theft of money. (Eitt dep. at 167).

7. In November 1998, following a reportedly suspicious return transaction in the Cosmetics Department, a **[*6]** surveillance camera was installed in the ceiling over one of the cash registers in the Cosmetics Department. (PTO at AF 8). The camera was placed in the ceiling and was focused through a pinhole in the ceiling. (Eitt dep. at 170). The camera was focused on the terminal, the terminal stand, and the sales counter. (Eitt dep. at 171). The decision to install the camera was made by and the investigation was conducted by Jeff Nobles. (Nobles dep. Vol. II at 29; Smith dep. at 105). Floyd Smith did not assist in the investigation but was kept advised of its progress. (Smith dep. at 105).

8. For a period of several weeks, the camera and connected recording equipment recorded activities at the register. The persons recorded on the video included plaintiff Karen Watson and her co-employee, Stacey Seals. (PTO at AF 8).

9. Watson challenges the "method of investigation" because it allegedly "presented problems in concretely assigning blame and accountability for alleged improprieties." Plaintiff's Opposition Brief at 15. Watson concedes, however, that "Nobles wrote his investigative report as if he had seen things on the videotape [and] deduced what was occurring from matching the transactions **[*7]** listed on the journal tape [which is the McRae's cash office recording of the transactions at that terminal] with what he believed he saw occurring on the videotape." *Id.* at 16. Although Watson essentially contends that certain alleged improprieties were misconstrued or did not violate store policy, she proffers nothing to contradict that the surveillance tape and corresponding terminal detail documentation showed the following activity by the plaintiff:

-- On November 20, 1998, Ms. Watson and Associate Stacey Seals were shown doing a *cash return* totaling $ 99.74. The cash drawer was opened and closed immediately with *no cash being removed*.

-- On November 21, 1998, Ms. Watson was observed ringing a cash sale of $ 68.67. She was given a $ 100 bill and returned $ 31.33 in change to the customer. Stacey Seals then voided the transaction with Karen Watson standing beside her, but no money was removed from the terminal.

-- On November 21, 1998, Ms. Watson handed Stacey Seals cash given her by a customer. Ms. Seals then did a no-sale to open the cash drawer but did not put the cash in the terminal. Instead, she folded the money in her left hand, bent down, **[*8]** and placed her hand under the terminal stand. Merchandise was then bagged and given to the customer.

-- On November 25, 1998, Ms. Watson voided a cash sale in the amount of $ 51.78, but did not take any money from the terminal. Later, she rang a cash sale of $ 11.45, was given $ 12.00, and, while getting change of $ .53, *she took an undetermined amount of cash from the drawer and folded it in her left hand*.

-- On November 25, 1998, Ms. Watson was given cash as she did a no-sale on the terminal, and she placed the cash in the terminal and gave merchandise to the customer. Later, she rang a cash sale totaling $ 24.53 and was given $ 40 by

the customer. When she opened the cash drawer, she took out a $ 20 bill and placed it on top of the $ 40 received from the customer. *She folded the money in her left hand and placed her hand in the left pocket of her smock.* She gave the customer $ 15.47 in change from the cash drawer.

-- On November 28, 1998, Ms. Watson rang a cash sale of $ 53.96. *She was given $ 60 in cash which she folded in her left hand as she gave the customer $ 6.04 change.* Shortly thereafter, she did a cash return for $ 65.40. She opened the cash drawer, **[*9]** but she took no money out.

-- On December 2, 1998, Ms. Watson did a no-sale, *took $ 40 from the cash drawer and put it behind some boxes. Shortly thereafter she folded the $ 40 in her left hand and put it in her pocket.* Later on the same day, Ms. Watson rang a cash return of $ 53.41, but took no money from the cash drawer when it opened. Later on the same day, Ms. Watson did a cash return of $ 39.24. *She took $ 50 from the terminal and folded it in her left hand while she gave the customer $ 39.24 in change.* She then voided a cash sale of $ 46.33 but took no money from the terminal.

(Nobles dep. Vol. I at 147-89; Nobles Report at Exh. 2)(emphasis added).

10. In the transactions recorded on tape, transactions are voided but no money is taken out of the terminal. (Nobles dep. Vol. I at 156-58). When a customer returns merchandise and a cash sale is voided, money should be returned to the customer. Watson challenges this fact only to the extent that a voided cash sale in the amount greater that $ 75.00 "must be paid directly from the Cash Office and not the floor terminal." Plaintiff's Opposition Brief at 17. Watson also contends that refunds of less than $ 75.00 **[*10]** cannot be made from the terminal if the payment of such a refund "would deplete the terminal of change." *Id.* This latter contention, however, is not applicable to the incident set forth above wherein Watson, on November 25, 1998, voided of a cash sale in the amount of $ 51.78, and did not take any money from the terminal because she thereafter took an indeterminate amount of cash from the terminal at the time she rang a cash sale of $ 11.45 and was getting the required change of only $ .53.

11. The results of the surveillance was recorded in a written narrative prepared by Jeff Nobles. (Nobles Report at Exhibit 2 to Nobles dep.). The report was prepared by Nobles without assistance from Floyd Smith, the Regional Loss Prevention Manager. (Smith dep. at 117). Nobles notified Smith of the results of the investigation and also asked Tom Eitt, the Store Manager, for permission to interview Watson and Stacey Seals. Eitt was asked to review the tape and, after doing so, concluded that "I don't know where the money went." Eitt then concurred in the decision to interview Watson and Seals. (Eitt dep. at 186, 230). The interviews were conducted by Nobles and Smith. (Nobles dep. Vol. I at **[*11]** 108-109).

12. Watson was interviewed first. According to Watson's version of what happened, Smith first explained to her who he and Nobles were and their jobs. Smith then explained to her details about the shortage in the Cosmetics Department and asked her if she had any idea why the shortage was so high. Watson said that she felt that she was not there to discuss the shortage and asked why she was there. At that point Smith told her that there was an incident where she had rung a sale, voided it out at the terminal, and pocketed the money. (Plaintiff's dep. at 74-76). Watson then denied that she had pocketed any money and asked to see the video. Watson was not shown the video but was shown the sales receipt for the sale. Watson testified that Smith told her to admit it and that if she did not, he would "make sure that I was prosecuted to the fullest, and he was going to make sure that my family, me and my family . . . had the worst Christmas we ever had." (Plaintiff's dep. at 77). Tom Eitt

then came into the room. According to Watson, Eitt told her "Karen, you need to go on and admit it, I saw you too." Watson asked him what he saw, and he said "I saw you when you took the money. **[*12]** " Watson again asked to see the video. Eitt then asked Watson to give him all her McRae's belongings and her McRae's credit card, which she did. Watson testified that Eitt kept telling her that "I'm sorry this happened, Karen, you're a nice person." (Plaintiff's dep. at 82-83). Eitt told her that she was suspended until he got back with her on Monday. (*Id.* at 87; PTO at AF 9).

13. Watson argues that "Smith specifically told her that she could not leave the room until she admitted to stealing." Plaintiff's Opposition Brief at 20. Watson admitted in her deposition, however, that she never sought to leave the room and that "I felt like if I had have left, I would have proved to them that I was guilty of something, and I wasn't." (Plaintiff's dep. at 80). In fact, at one point Watson was asked to leave the store. She responded that she did not have a way home and asked if she could call her husband. (*Id.* at 86). Watson asked to stay in the office until her husband came. (*Id.* at 85). Watson even claims that she was told that if she didn't leave, the police would be called. (*Id.* at 87). Nevertheless, Watson remained in the office until her husband arrived. She then told Nobles **[*13]** to "show my husband what they was accusing me of doing." When they declined to show him the video, her husband said "you don't have to show it to me, you'll show it to my lawyer." (*Id.* at 88).

14. Stacey Seals was interviewed after Watson. During Seals' interview, Smith is alleged to have told Seals that Watson had "admitted to stealing money and/or property from McRae's." (Amended Complaint, P 61). At the conclusion of her interview, Seals was also suspended. (PTO at AF 9).

15. On the following Monday, Watson and Seals were advised by Eitt that their employment with McRae's was terminated. (PTO at AF 10). The two persons hired to replace Watson and Seals were black. (PTO at AF 11).

16. The decision to recommend Watson's termination was made by Store Manager Tom Eitt based on his review of the video surveillance tape and terminal detail tape. His recommendation was concurred in by Human Resources Director Skip Scheidemantel who also reviewed the videotape and terminal detail tape. Eitt has testified that the information he viewed "showed serious violation of company policies, including Ms. Watson's possession of cash that did not go where it was supposed to go." (Eitt Declaration, **[*14]** P 3). In the words of Eitt, "the tape, in my mind was conclusive that the money was not placed back in the register . . . and that's a termination offense." (Eitt dep. at 109).

17. Watson has proffered no evidence to refute defendants' contention that neither Nobles nor Smith had any involvement in the actual decision to terminate Watson's employment. (Nobles dep. Vol. II at 86; Smith dep. at 158).

18. Following her termination, the decision to prosecute Watson was made by Jim Mulligan, the Company's Director of Loss Prevention. A copy of the investigative report was sent to Mulligan who then came to the store and reviewed the video while Nobles narrated the incidents. (Nobles dep. Vol. II at 79). Smith was not in favor of prosecuting Ms. Watson and was not involved in the decision to prosecute Ms. Watson. (Smith dep. at 129-30, 146, 151-152). Store Manager Tom Eitt was not involved in the decision to prosecute the plaintiff, in the issuance of a warrant for her arrest, or in her prosecution. (Eitt Declaration at P 7). Mulligan alone made the decision that Watson should be prosecuted for the December 2 incident in which she is shown on videotape taking $ 40 from the terminal and **[*15]** first placing it behind some boxes and subsequently folding the $ 40 in her left hand and putting it in her pocket. That incident was selected because it appeared to be the most clear case. (Nobles dep. Vol. II at 73-74).

19. A warrant was issued for Watson's arrest on a charge of third degree theft, the specific charge being theft of $ 40. The warrant was issued based on an affidavit executed by Jeffrey Nobles. Watson was arrested, held, and released on bond. Following a trial in the Municipal Court of Mobile, Watson was acquitted on the third degree theft charge. (PTO at AF 12).

20. It is undisputed that Watson is shown on the video taking $ 40 and putting it in her pocket. Watson, in her defense, asserts only that the following is what really happened:

-- Watson took the $ 40 out of the terminal to make a change request. (Plaintiff's dep. at 111).

-- She "got sidetracked" when she was called to the Fashion Fair Counter to wait on a customer. (*Id.* at 111-12).

-- She says that "I couldn't leave the money just laying out because I was responsible for it." (*Id.* at 112).

-- She just stuck it in her pocket while she waited on the customer. (*Id.* at **[*16]** 112).

-- When the customer left, she filled out a change request form. (*Id.* at 113).

-- Another customer came up and -- again -- she "got side tracked." (*Id.* at 116).

-- During this time, she was the only associate on the floor because the others were at lunch and she could not leave the department. (*Id.* at 118).

-- When the others came back from lunch, Watson contends that the money "slipped my mind." (*Id.* at 118).

-- She contends that the $ 40 and a change request form were later found in her "clientele book." The change form was "torn and balled up." She says that it was not that way when she last saw it. (*Id.* at 114).

21. The $ 40 was found by a Fashion Fair representative after the warrant had been issued for plaintiff's arrest. (Plaintiff's dep. at 149; Nobles dep. Vol. II at 52). It is undisputed that the defendants had no knowledge of any of the alleged facts relating to the plaintiff's excuse at the time of the plaintiff's interview or the decision to terminate her employment. (*Id.* at 52). Watson gives no explanation of how or why the money went from behind the boxes to her pocket. Nor does she explain how, why, or when **[*17]** the money went from her pocket to the clientele book.

22. Despite Watson's contentions to the contrary, there is no direct evidence of discrimination in this record. Specifically, there is no admissible evidence to support the contention that Floyd Smith ever stated that "he did not want any black people in McRae's." (Plaintiff's Opposition Brief at 27). Even had such a statement been properly supported, there is no evidence that it was in any manner directed at Watson and it is undisputed that the decision to terminate and prosecute Watson was not made by Smith. There is also no evidence to support the contention that "both Nobles and Smith" told Laura Bosco that they were targeting the "black girls" in the Cosmetics and Fragrance Department as suspects in the store's inventory shortage. (*Id.*) Laura Bosco's affidavit testimony simply indicated that either Smith or Nobles (not "Nobles and Smith") told her (after first "blatantly" accusing her of stealing) that "they did not think I was the one who did the stealing because

they suspected the 'black girls'." (Bosco Aff. at P 7).

23. In contrast to Watson's attempt to cloud the issues and facts in this case, the evidence demonstrates **[*18]** that a $ 70,000 shortfall in the Cosmetics and Fragrance Department of McRae's Mobile Store led to an investigation which targeted that department in that store which ultimately led to the installation of a hidden video camera over the terminal in that department. The appearance of several suspicious transactions involving Watson and her co-employee Stacey Seals were reported by Jeff Nobles to Floyd Smith. Smith was present during and did the questioning of Watson during her interview. Smith, among others, recommended that Watson be terminated. The video tape and the journal tape were reviewed by Tom Eitt, the Store Manager, who then recommended to his boss, Regional Vice President Lyn Nutt, that Watson be terminated. Lyn Nutt also reviewed the video and journal tapes and recommended Watson's termination. The decision to terminate Watson was then approved by Skip Scheidemantel, Director of Human Resources. (Eitt dep. at 86-89.

CONCLUSIONS OF LAW

Watson has asserted 10 separate claims against the defendants. The Court will consider separately below each these claims:

## A. Title VII Claim for Discriminatory Discharge:

This claim is being pursued solely against McRae's as **[*19]** plaintiff's employer. n3 *HN1* Title VII of the Civil Rights Act of 1964, as amended, makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment because of such individual's race..." 42 U.S.C. § 2000(e)-2(a)(1). Plaintiff claims that she was investigated, suspended and terminated from McRae's solely because she was black. As the Eleventh Circuit has held, *HN2* "by necessity, a plaintiff must make a prima facie case to avoid summary judgment." *Palmer v. District Board of Trustees of St. Petersburg, 748 F.2d 595, 599 (11th Cir. 1984),* rehearing denied, 752 F.2d 649 (11th Cir. 1985). As indicated above, the Court finds no evidence in this record of direct discrimination. Plaintiff must, therefore, establish her prima facie case by circumstantial evidence and this she has failed to do.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - -

n3 Watson has asserted her Title VII claim as well against defendants Smith, Nobles, and Eitt. However, such *HN3* Title VII claims against the individual defendants are not maintainable under settled Eleventh Circuit precedent which precludes Title VII claims against employee defendants. *See Mason v. Stallings, 82 F.3d 1007, 1009 (11th Cir. 1996)* ("This Circuit has previously held that there is no individual responsibility under either of those Acts."); *Busby v. City of Orlando, 931 F.2d 764, 772 (11th Cir. 1991)* ("Individual capacity suits under Title VII are similarly inappropriate. The relief granted under Title VII is against the *employer*, not individual employees whose actions would constitute a violation of the Act . . . .").

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - - -

**[*20]** *HN4*

One method by which the plaintiff could establish a prima facie case is to show: "(1) that she is a member of a protected class, (2) that she was qualified for the position held, (3) that she was terminated, and (4) that she was replaced by a person outside the protected class."

*Coutu v. Martin County Board of County Commissioners,* 47 F.3d 1068, 1073 (11th Cir. 1995).* Inasmuch as plaintiff was replaced by another person of plaintiff's race, this method is unavailing.

HN5*Alternatively, plaintiff may establish a prima facie case "by showing: (1) she belongs to a racial minority; (2) she was subjected to adverse job action; (3) her employer treated similarly situated employees outside her classification more favorably; and (4) she was qualified to do the job." *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir. 1997).* Where the evidence does not fit neatly into a classic formulation of the prima facie case, a prima facie case may also be established by "proof of actions taken by the employer from which we may infer discriminatory animus." *Hill v. Metropolitan Atlanta Rapid Transit Authority,* 841 F.2d 1533, 1540 (11th Cir.), modified, **[*21]** 848 F.2d 1522 (11th Cir. 1988).* It is upon this method that Watson must rely. She has, however, failed to establish that she was treated less favorably than similarly situated white employees.

HN6*It is Watson's burden to establish that the comparators upon which she relies "are similarly situated in all relevant respects." *Holifield,* 115 F.3d at 1562.* This analysis requires the Court to "consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Id.* "If plaintiff fails to identify similarly situated, non-minority employees who were treated more favorably, her case must fail because the burden is on her to establish a prima facie case." *Jones v. Bessemer Carraway Medical Center,* 137 F.3d 1306, 1311 (11th Cir. 1998).*

Watson admits that the only basis for her belief that she was discriminated against because of her race is her contention that Laura Bosco was a similarly situated white employee who was treated more favorably. According to Watson, Laura Bosco was questioned about the shortage and not terminated. (Plaintiff's dep. at 165). This contention is without merit. **[*22]** Laura Bosco was not "similarly situated in all material respects" as required by Eleventh Circuit precedent. In particular, Watson has failed to establish that Bosco was "accused of the same or similar conduct." The record evidence establishes that Bosco was interviewed by Jeff Nobles after he reviewed information that she had a prior conviction for shoplifting which had not been revealed on her employment application. (Nobles dep. Vol. I at 69). Nobles learned that the shoplifting incident had occurred 23 years earlier and Bosco explained that she had not recalled the incident. (*Id.* at 69). Watson nonetheless argues that "McRae's corporate policy explicitly states that this is a termination offense." Plaintiff's Opposition Brief at 12. This Court concludes, however, that the failure to report a juvenile shoplifting conviction which occurred 23 years prior to the completion of an employment application is not comparable to an alleged contemporaneous theft of property.

Watson also argues that "despite Bosco's admission that she took unauthorized testers and this too is an explicit automatic termination offense, McRae's did not terminate her employment." Plaintiff's Opposition Brief **[*23]** at 12, citing Nobles dep. Vol. I at 78. Thus Watson attempts to assert that Bosco was also guilty of theft but not terminated. However, Watson has, with apparent deliberateness, misquoted the evidence of record. Jeff Nobles specifically testified that, during the interview, Bosco volunteered that she had taken some fragrance testers that had been given to her by someone who was "*authorized to give them to her.*" (Nobles dep. Vol. I at 70-72, emphasis added). n4 There is no evidence in this record that Bosco stole anything from McRae's. See e.g., *Wadley v. J.R. Tobacco Co.,* 836 F. Supp. 331, 62 Fair Empl. Prac. Cas. (BNA) 1234, 1235 (E.D. N.C. 1993)* ("Plaintiff has not challenged defendant's claim that Sheila Parrish, the white employee found in possession of a t-shirt at the same time . . . had validly purchased the shirt from a sales representative. Therefore, Parrish was not similarly in violation of company policy, and was not reasonably subject to the same type of treatment as plaintiff."). In contrast, Watson was recorded on video tape and observed to have repeatedly violated cash handling procedures which included not less than five separate occasions where she folded money **[*24]** in her hand and two separate occasions where she folded money and put it in her pocket. Those

instances included the plaintiff voiding cash sales in which she gave no money to any customers.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - -

n4 At page 78 of his deposition (Vol. I), Nobles merely answers in the negative the question "And so Ms. Bosco was not terminated for taking the testers." Nobles never testifies that Bosco took "unauthorized" testers.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

In addition, the Court agrees that *HN7*"Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules." *Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1185 (11th Cir. 1984).* It was not improper for defendants to treat Laura Bosco's acceptance of fragrance testers from an authorized person as something entirely different from the plaintiff taking cash and placing it under the terminal stand. See *Jones v. Bessemer Carraway Medical Center, 137 F.3d 1306, 1311 (11th Cir. 1998)* (" . . . Defendant **[*25]** was entitled to conclude that taking a day off after a request for the day off is denied is not insubordination under its rules, but instead an attendance violation . . . Thus, plaintiff's use of Smith and Nettles as comparators is unwarranted.").

Finally, Watson cannot establish a prima facie case by any evidence from which a discriminatory animus may be inferred. Watson was terminated based on video evidence which included, among other things, footage of her putting money from the terminal in her pocket. Watson was replaced by another black. Watson has not presented evidence establishing that any other employee similarly situated was not terminated. Under these facts, there is simply no evidence from which discriminatory animus could reasonably be inferred. *HN8*"A plaintiff, when faced with a motion for summary judgment, cannot rely on attenuated possibilities that a jury would infer a discriminatory motive, but rather must come forward with sufficient evidence to establish a prima facie case and respond sufficiently to any rebuttal by the defendant to create a genuine issue of material fact." *Pace v. Southern Railway System, 701 F.2d 1383, 1391 (11th Cir. 1983).* **[*26]**

Even if the Court assumed that plaintiff had established a prima facie case, her discharge claim would fail because defendants have articulated a legitimate nondiscriminatory reason for her discharge and plaintiff cannot establish that the articulated reason is a pretext for intentional race discrimination. As the Eleventh Circuit has stated, *HN9*"establishing a prima facie case . . . does not always suffice for a plaintiff to survive a motion for summary judgment." *Palmer v. District Board of Trustees of St. Petersburg, 748 F.2d 595, 599 (11th Cir. 1984),* rehearing denied, *752 F.2d 649 (11th Cir. 1985).* "Even where a prima facie case has been established but the defendant has rebutted with a proffer of legitimate, nondiscriminatory reasons for the discharge, a genuine issue of material fact is not automatically presented." *Pace, 701 F.2d at 1391.* It cannot be seriously disputed that the defendants in the case at bar have stated a legitimate reason to terminate the plaintiff. *HN10*Consequently, Watson "must show that defendant's articulated reason for discharging [her] was a pretext for discrimination." *Rollins v. Techsouth, Inc., 833 F.2d 1525, 1529 (11th Cir. 1987).* **[*27]** Moreover, as the Supreme Court has admonished, Watson must show "*both* that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Center v. Hicks, 509 U.S. 502, 515, 113 S. Ct. 2742, 2752, 125 L. Ed. 2d 407, 422 (1993)* (emphasis in original). The burden Watson must shoulder in light of the nondiscriminatory reason articulated by the defendants in this case has also been described by the Eleventh Circuit in *Mauter v. Hardy Corp., 825 F.2d 1554 (11th Cir. 1987):*

*HN11*

Once the defendants articulated a legitimate reason for the discharge, the burden shifted to Mauter to prove by a preponderance of the evidence that age discrimination was a reason for his discharge. The plaintiff, to shoulder this burden, must introduce evidence that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence. *Goldstein v. Manhattan Industries, Inc.*, 758 F.2d 1435, 1445 (11th Cir. 1985)."

825 F.2d at 1558. The burden Watson must satisfy is to come forward with "specific facts" evidencing intentional race discrimination. *Foster v. Arcata Associates, Inc.*, 772 F.2d 1453, 1463 (9th Cir. 1985), [*28] cert. denied. 475 U.S. 1048, 89 L. Ed. 2d 576, 106 S. Ct. 1267 (1986). Likewise, the requirement of specific facts has been held to require a plaintiff to come forward with evidence which is "significantly probative" of intentional discrimination. *Branson v. Price River Coal Co.*, 853 F.2d 768, 771-72 (10th Cir. 1988).

Watson argues that pretext is established by the fact that $ 40 was found folded in her clientele book weeks after her discharge. Thus, Watson essentially contends that the found money establishes her innocence. n5 *HN12* The issue is not, however, whether Watson was in fact guilty, but whether the decision maker had a good faith belief that she engaged in the conduct for which she was discharged. See *Bonaparte v. NYC Department of Housing*, 1997 U.S. Dist. LEXIS 3761, 75 Fair Empl. Prac. Cas. (BNA) 640, 645 (S.D.N.Y. 1997) ("Even assuming that Bonaparte has presented sufficient evidence to raise an issue of fact as to whether he actually engaged in the charged conduct, and even assuming for purposes of this motion that he did not do so, the incontrovertible evidence shows that HPD *believed* in good faith that he had done so."); *Gilbert v. West Georgia Medical Center Authority*, 629 F. Supp. 738, 40 Fair Empl. Prac. Cas. (BNA) 1510, 1512 (N.D. Ga. 1985) [*29] ("Plaintiff was terminated because the defendants in good faith believed she had falsified a hospital form.").

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n5 The Court agrees that Watson's explanation of the $ 40 transaction and the testimony supporting it is in itself highly suspicious. The money was found by a friend of Watson in her clientele book weeks after Watson's termination. Plaintiff testified that she never put the finding of that $ 40 together with what she was accused of doing until the day of her criminal trial when evidence regarding the $ 40 being put in her pocket was presented. (Plaintiff's Dep. at 115). That testimony by Watson cannot possibly be true, however, because Watson also testified that *before* the criminal trial she called Gwen Ruffin, the friend who found the money, to get her address for the criminal trial. (Plaintiff's Dep. at 150).

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

*HN13* Determination of whether the decision maker had a good faith belief that Watson engaged in the conduct for which she was discharged requires consideration of the facts as they were known at [*30] the time of the decision, not what was discovered after the decision. See *Davis v. Greensboro News Co.*, 1985 U.S. Dist. LEXIS 13998, 39 Fair Empl. Prac. Cas. (BNA) 535, 539 (M.D. N.C. 1985) ("The determination of the 'credence' of the reasons must necessarily be measured at the time of a plaintiff's discharge [and] the goal of a court is to determine not whether defendant's reasons for discharge were in fact correct,

but instead whether defendant believed them to be correct at the time of discharge."); *Holt v. Indiana Division of Labor*, 57 Fair Empl. Prac. Cas. (BNA) 1836, 1842 (N.D. Ind. 1990) ("The proper inquiry is whether, at the time of Mr. Holt's discharge, there was so little evidence that he falsified his records that any decision to the contrary must have been a pretext for an improper motive."). As applied to the case at bar, there was ample evidence that Watson had engaged in multiple questionable transactions, including one in which she put two twenty dollar bills in her pocket. This is clearly sufficient to form the basis for a good faith belief that Watson engaged in the conduct for which she was discharged. *See Williams v. Southwestern Bell Telephone Co.*, 718 F.2d 715, 33 Fair Empl. Prac. Cas. (BNA) 297, 298 (5th Cir. 1983) **[*31]** ("There was ample evidence . . . that Bell was motivated not by her race but by its suspicions with regard to her honesty.").

Because Watson has failed to come forward with specific, concrete, significantly probative facts to establish that the articulated reason for her discharge is a pretext for intentional race discrimination, summary judgment is due to be entered on her discharge claim. n6

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n6 Watson's contention that she has proven discrimination under the "cat's paw" theory is specious. *HN14*🟥Under such a theory, the Court agrees that causation may be established if the plaintiff shows that the decisionmaker followed the biased recommendations *without* independently investigating the complaint against the employee. *See, Llampallas v. Mini-Circuits, Inc.*, 163 F.3d 1236, 1248 (11th Cir. 1998). *See also, Wright v. Southland Corp.*, 187 F.3d 1287, 1304 (11th Cir. 1999); *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331-32 (11th Cir. 1999). As applied to this case, however, there is ample evidence that Watson's conduct was not only questionable but independently investigation throughout the chain of command. There is no evidence that any one of the individuals who recommended Watson's termination in any way manipulated the individual who ultimately made the decision to so terminate her.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**[*32]**

## B. Malicious Prosecution Claim:

Watson's second claim is for the tort of malicious prosecution based on Jeff Nobles having signed the warrant which resulted in plaintiff being arrested and prosecuted for third degree theft. Under the facts of this case in which Watson admits that she is shown on videotape taking $ 40 from a cash register which she first placed behind some boxes and then folded it up and put it in her pocket, Watson as a matter of law has no maintainable claim for malicious prosecution. *HN15*🟥Under Alabama law, the elements of a malicious prosecution are "(1) a prior judicial proceeding; (2) instigated by the defendant(s); (3) *without probable cause*; (4) with malice; (5) which was terminated in favor of the plaintiff; and (6) damage." *Delchamps, Inc. v. Larry*, 613 So. 2d 1235, 1238 (Ala. 1992); *S.S. Kresge Co. v. Ruby*, 348 So. 2d 484, 487 (Ala. 1977)(emphasis added). To prevail in a malicious prosecution action, a "plaintiff must prove all of the elements." *Delchamps, Inc. v. Morgan*, 601 So. 2d 442, 445 (Ala. 1992). As the Alabama Supreme Court has stated, "an action for malicious prosecution is not favored **[*33]** at law." *Alabama Power Co. v. Neighbors*, 402 So. 2d 958, 962 (Ala. 1981). Plaintiff in this case cannot establish the essential element of lack of probable cause.

*HN16*🟥"Lack of probable cause is an essential element of a cause of action for malicious prosecution." *Ex Parte City of Gadsden*, 718 So. 2d 716, 718 (Ala. 1998). Probable cause

means "such a state of mind of the prosecutor as would lead a man of ordinary caution and prudence to believe or entertain an honest and strong suspicion that the person arrested is guilty." _Birwood Paper Co. v. Damsky_, 285 Ala. 127, 229 So. 2d 514, 521 (Ala. 1969). **HN17** "The malicious prosecution plaintiff has the burden of proving a negative -- i.e., the complete absence of evidence from which a reasonable jury could infer that there was probable cause from which the defendant could have instituted the suit in question." _McMillian v. Johnson_, 878 F. Supp. 1473, 1536 (M.D. Ala. 1995). "When the facts as they relate to the issue of probable cause are undisputed . . . the question of whether the facts constitute probable cause is one of law for the court . . . ." _Gulf States Paper Corp. v. Hawkins_, 444 So. 2d 381, 390 (Ala. 1983). **[*34]**

In determining whether probable cause existed, the issue is dependant on the defendant's "subjective belief" even if that belief is subsequently shown to be incorrect. _Delchamps v. Morgan_, 601 So. 2d at 445. The issue is not whether the plaintiff was in fact guilty of the charge, but whether the defendant "in fact saw events that would lead him to believe that she was guilty." _Id. See also_, _Ex Parte City of Gadsden_, 718 So. 2d 716, 719 (Ala. 1998) ("The basic question here is not whether Lawder was in fact guilty . . . but whether Brewer reasonably could have believed that he was . . . ."). Moreover, "the existence of probable cause is to be judged in light of the facts as they appeared when the underlying action was filed." _Fina Oil & Chemical Co. v. Hood_, 621 So. 2d 253, 257 (Ala. 1993).

In this case, the facts relating to probable cause are undisputed. Indeed, they are recorded on videotape. As a result, Watson admits that she took $ 40 from a cash register, first placed it behind some boxes, and then folded the money in her hand and placed it in her pocket. Later, she performed a cash return in the amount of $ 53.41 but is not **[*35]** shown on the tape as removing any money from the terminal to give to a customer. These facts are clearly sufficient to establish probable cause of third degree theft as defined by **HN18** ALA. CODE 1975 § 13A-8-5 ("the theft of property which does not exceed $ 250 in value and which is not taken from the person of another constitutes theft in the third degree."). Pure common sense tells us that when a department store employee takes cash out of a cash register and puts it in her pocket a reasonable person could believe that a theft is occurring. These facts are akin to the situation in _Delchamps v. Morgan_, 601 So. 2d at 442, where a Delchamps employee observed the plaintiff pick up a pack of cigarettes and walk toward the rear of the store. He then observed her place the pack of cigarettes in her pocket. The plaintiff was stopped at the checkout line when she placed the pack of cigarettes on the conveyor belt along with other items. When questioned, she claimed that what the Delchamps employee had seen in her pocket was a partial pack of cigarettes that she had brought in the store with her. The Supreme Court held that "because Morgan undisputably had a visible pack of cigarettes **[*36]** in her pocket, Mims could have entertained an honest and strong suspicion that she had concealed store property." The Court held that "even if Mims's belief that Morgan had a complete pack of cigarettes in her pocket was subsequently shown to be incorrect, the question should not have been submitted to the jury." 601 So. 2d at 445.

So also in this case could the defendants have entertained an honest and strong suspicion that Watson was stealing the money because she is undisputedly shown on videotape removing $ 40 from the terminal, first placing it behind some boxes, and then folding it in her hand and placing it in her pocket. n7 _See also Gunter v. Pemco Aeroplex, Inc._, 646 So. 2d 1332, 1334 (Ala. 1994) ("The evidence indicates that when Albright initiated the prosecution he believed his eyes and entertained an honest and strong suspicion that Gunter intentionally struck the bus."). The Court concludes that plaintiff cannot establish the essential element of lack of probable cause. n8

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n7 Consequently, this case is distinguishable from _Delchamps, Inc. v. Larry_, 613 So. 2d at

1235, a case in which the store manager "was not sure when or where he first saw the steaks that were allegedly stolen that morning"; "only briefly saw the [alleged shoplifter]"; "did not question [the accused man] to determine his whereabouts that morning"; and "made no conversation between himself and [the accused man] in an effort to determine if there was probable cause to make an arrest. 613 So. 2d at 1238. It is also distinguishable from _Delchamps, Inc. v. Bryant_, 738 So. 2d 824, 834 (Ala. 1999), inasmuch as this case does not involve a mistake regarding the identity of the plaintiff or the receipt of any "notice of a problem [which] may be inconsistent with good faith." **[*37]**

n8 The malicious prosecution claim against Store Manager Eitt is due to be dismissed for the additional and independent reason that while he made the decision to terminate the plaintiff, he had nothing at all to do with the decision to prosecute Watson or the prosecution itself. (Eitt Declaration, P 7).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## C. Abuse of Process:

Watson's third claim is for abuse of process as to which she alleges abuse of process (1) in "[t]he issuance of the warrant for plaintiff's arrest" and (2) "the prosecution based upon that warrant." (Amended Complaint, P 38). These allegations do not make an abuse of process claim. _HN19_ The elements of abuse of process are: "1) the existence of an ulterior purpose, 2) a wrongful use of process, and 3) malice." _C.C.&J., Inc. v. Hagood_, 711 So. 2d 947, 950 (Ala. 1998). The essence of the tort of abuse of process is the wrongful use of process _after_ it has been issued. _Wilson v. Brooks_, 369 So. 2d 1221, 1222 (Ala. 1979)("The _HN20_ chief distinction between abuse of process and malicious prosecution is that the former rests upon the improper **[*38]** use of regularly issued process, whereas the latter has to do with the wrong in the issuance of the process or in causing the process to be issued."). In this case there is no evidence that the defendants improperly used the warrant after its issuance. Indeed, Watson's claim is not improper use after issuance, but "the issuance of the warrant for plaintiff's arrest." (Amended Complaint, P 38). Accordingly, Watson's claim of abuse of process based on "issuance of the warrant" fails as a matter of law.

So also there is no basis for Watson's claim of abuse of process based on "the prosecution based on that warrant." _HN21_ Alabama law is clear that proceeding with a criminal prosecution even for an improper purpose is not sufficient to constitute abuse of process. To prove abuse of process, a plaintiff must show that the defendant "somehow acted outside the boundaries of legitimate procedure after the charge had been filed." _Hagood_, 711 So. 2d at 951-52. There is no evidence of any departure from legitimate procedure in this case. All that was done by the defendants after issuance of the warrant was to appear and testify at trial. As a matter of law, this is insufficient to **[*39]** constitute abuse of process.

## D. False Imprisonment:

Watson's fifth claim is for alleged false imprisonment based on (1) her alleged "unlawful detention . . . at McRae's Inc." and (2) "by unlawfully causing the plaintiff to be arrested and imprisoned for a crime which she did not commit." (Amended Complaint, P 43). _HN22_ In order to establish false imprisonment, Watson must establish that she was unlawfully detained and thereby deprived of her personal liberty through a direct restraint of her person. _Swanson v. Civil Air Patrol_, 37 F. Supp. 2d 1312 (M.D. Ala. 1998); _Hardy v. Town of_

*Hayneville,* 50 F. Supp. 2d 1176 (M.D. Ala. 1999).

Watson's claim of false imprisonment is predicated on the events which occurred at McRae's and fails because the undisputed facts do not establish that she was detained against her will by a direct restraint of force, as demonstrated by the following points:

> -- Watson admits that she did not want to leave the office testifying that "I felt like if I would have left, I would have proved to them that I was guilty of something and I wasn't." (Plaintiff's dep. at 80).

> -- Watson had no way home and had to **[*40]** call her husband to come get her. The first time she asked to call her husband, she was allowed to do so. (*Id.* at 86).

> -- Watson asked permission to remain in the office until her husband arrived.

> -- When she was asked to leave she refused to do so and even claims that McRae's threatened to call the police if she did not do so. (*Id.* at 87).

> -- When Watson's husband arrived, she left.

The Court concludes that Watson was not restrained from leaving and cannot establish the element of a direct restraint.

The second aspect of Watson's false imprisonment is based on her arrest and detention pursuant to a warrant issued by a magistrate. This aspect of the claim fails as a matter of law. *HN23*An arrest and imprisonment pursuant to a valid warrant cannot form the basis for a false imprisonment claim. W. Prosser, LAW OF TORTS 4th Ed. 1971 at 49 ("If the defendant complies with the formal requirements of the law, as by swearing out a valid warrant, so that the arrest of the plaintiff is legally authorized, the court or its officers are not his agents to make the arrest, and their acts are those of the law and state, and not to be imputed to him."). It is as well the **[*41]** settled law in Alabama. See *Blake v. Barton Williams, Inc.,* 361 So. 2d 376 (Ala. Civ. App. 1978) ("If an arrest is made pursuant to a warrant issued by a lawfully authorized person, neither the arrest nor the subsequent imprisonment is 'false,' and, as a consequence, the complaining party's action must be one for malicious prosecution."). *HN24*Alabama law is also clear that a false imprisonment claim which is based on the same set of circumstances as a malicious prosecution claim is not maintainable. Thus, where a false imprisonment claim is based on an arrest and prosecution, the cognizable claim is for malicious prosecution, not false imprisonment. *K-Mart v. Asaro,* 751 So. 2d 513, 515 (Ala. Civ. App. 1999)(held that it was reversible error to submit a false imprisonment claim to the jury when it is based on the same facts and circumstances as a malicious prosecution claim). Such is the claim in the case at bar. n9

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n9 In addition, Watson's false imprisonment claim is not maintainable against Mr. Eitt on either theory advanced by plaintiff because he did not participate in any of the conduct which is alleged to constitute false imprisonment.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*42]

**E. Invasion of Privacy:**

Watson has abandoned this claim as against all defendants. Plaintiff's Opposition Brief at 4.

**F. Negligence and Wantonness:**

In Counts VI and VII respectively, Watson alleges that defendants "through the foregoing acts" acted negligently and wantonly. (Amended Complaint, PP 53, 56). The essence of Watson's claim, as set forth in her opposition brief and confirmed when orally questioned at the Pretrial Conference conducted in this case, is that the defendants were "negligent and/or wanton in the manner in which [they] conducted and documented [their] investigation." Plaintiff's Opposition Brief at 40 (re: Nobles), and as essentially applied to the remaining defendants at 41 (Smith), 42 (Eitt) and 43 (McRae's). Watson relies on general principles of negligence n10 and wantonness n11. Watson has failed, however, to set forth a legally recognized duty imposed against an employer which may be said to regulate the manner in which the employer investigates alleged wrongdoing by his employees.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n10 Watson sets forth the definition of "negligence" as "the failure to do what a reasonable prudent person would have done under the same or similar circumstances, or, the doing of something which a reasonable prudent person would not have done under the same and similar circumstances." Plaintiff's Opposition Brief at 39, *citing*, Alabama Pattern Jury Instructions, 2nd ed., § 28.01. [*43]

n11 Watson sets forth the definition of "wantonness" as "the conscious doing of some act or omission of some duty under knowledge of existing conditions and conscious that from the doing of such act or omission of such duty an injury will likely or probably result." Watson further states that "before a party can be said to be guilty of wanton conduct it must be shown that with reckless indifference to the consequences he either consciously and intentionally did some wrongful act or consciously omitted some known duty which produced the injury." Plaintiff's Opposition Brief at 39-40, *citing*, Alabama Pattern Jury Instructions, 2nd ed., § 29.00.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Watson seeks to apply *HN25*⚓the general rule that "every person owes every other person a duty imposed by law to be careful not to hurt him." Plaintiff's Opposition Brief at 39, *citing*, *Carrio v. Denson, 689 So. 2d 121, 124 (Ala.Civ.App. 1996).* Watson acknowledges that "to determine whether a duty existed, this court should consider a number of factors, including public policy, social considerations, and whether the injury was foreseeable [*44] to [the defendant]." *Id.* As the *Carrio* court makes clear, however, that: "The essential question is 'whether [plaintiff's] interests are entitled to legal protection against [defendant's] conduct.'" *Carrio, 689 So. 2d at 124, quoting* P. Keeton et al., Prosser and Keeton on the Law of Torts, § 53, at 357 (5th ed. 1984).

*HN26*⚓The Alabama Courts have steadfastly refused to modify, even on "public policy" grounds, the employee-at-will doctrine which provides that "an employment contract terminable at the will of either the employer or the employee may be terminated by either party at any time with or without cause" and was first recognized 100 years ago in *Howard v,*

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 7257          Page 21 of 24

Case 2:05-cv-00562-MEF-CSC     Document 36-11     Filed 04/18/2006     Page 43 of 46

*East Tennessee, V. & G. Ry.*, 91 Ala. 268, 8 So. 868 (1891). See, *Grant v. Butler*, 590 So. 2d 254, 256 (Ala. 1991). The Alabama Supreme Court "steadfastly declined to modify the employee-at-will doctrine by recognizing a cause of action sounding in tort for the wrongful termination of an employment contract when the employer's actions are in contravention of this state's public policy, but has chosen, instead, to rely upon legislative action to ameliorate some **[\*45]** of the harshness of the employee-at-will doctrine." *Grant*, 590 So. 2d at 256, citing, *McClain v. Birmingham Coca-Cola Bottling Co.*, 578 So. 2d 1299 (Ala.1991); *Salter v. Alfa Ins. Co.*, 561 So. 2d 1050 (Ala.1990), and the cases cited therein. The *Grant* court specifically refused to create a new tort remedy for employees who were terminated by their employers for reporting hazardous conditions in the workplace. Thus the doctrine remains intact and, *HN27* in Alabama, an employee may be terminated "with or without cause or justification" which means for a good reason, a wrong reason, or no reason." *See e.g., Hinrichs v. Tranquilaire Hospital*, 352 So. 2d 1130, 1131 (Ala. 1977), acknowledged in *Meeks v. Opp Cotton Mills, Inc.*, 459 So. 2d 814, 815 (Ala. 1984)(Beatty, J., dissenting). How then can Watson seriously contend that any duty exists in Alabama for an employer to conduct any particular kind of investigation of an employee's wrongdoing? If the Alabama Supreme Court and/or Alabama Legislature has failed to impose such a duty upon employers, this Court is without authority to dictate the manner in which an employer **[\*46]** conducts his business beyond the constraints of Title VII and similar anti-discrimination statutes. In the absence of a legal duty, none of the defendants in this case can be held liable for negligence or wantonness for the conduct about which the plaintiff complains.

To the extent Watson asserts a negligent or wanton supervision claim against McRae's, the Court agrees that there is no such claim asserted in the complaint. Even if there were such an allegation, *HN28* it is fundamental to a claim of negligent or wanton supervision that a plaintiff must establish that the underlying tortious conduct took place. *See e.g., Mardis v. Robbins Tire & Rubber Co.*, 669 So. 2d 885, 889 (Ala. 1995) ("in addition to proving the underlying tortious conduct of an offending employee."). For the reasons stated above, Wayson has failed to establish that she was discriminated against because of her race, or any of her other contentions. Accordingly, any negligent or wanton supervision claim also fails as a matter of law. n12

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n12 Moreover, Watson could not, in any event, establish negligence or wantonness by merely establishing that she was subjected to discrimination or by proof of one of her other claims. *HN29* "The mere fact that an injury occurred is not evidence of negligence and . . . in negligent supervision cases negligence will not be found by inference." *N.J. v. Greater Emanuel Temple Holiness Church*, 611 So. 2d 1036, 1037 (Ala. 1992). Thus, Watson was required to "affirmatively [show] that had the master exercised due and proper diligence, the master would have learned of the [servant's] incompetency." *Mardis*, 669 So. 2d at 889. Watson has failed to establish that defendants were negligent in supervising any employee she claims to have discriminated against her. Finally, Watson has not established negligent supervision by either defendants Nobles or Eitt. There is no claim asserted in this case which is based on any conduct by anyone that Nobles was responsible for supervising. The same is true with respect to Eitt since Nobles himself was under the supervision of Regional Loss Prevention Manager Smith, not Store Manager Eitt.

- - - - - - - - - - - End Footnotes - - - - - - - - - - - - - -

**[\*47]**

**G. Defamation:**

The only alleged defamatory statement set out in the complaint is the allegation "Floyd Smith and/or Jeff Nobles . . . stated to Stacey Seals that Karen Watson admitted to stealing money and/or property from McRae's." (Amended Complaint, P 61). Even if true, this allegation is insufficient to prove defamation because Watson has not established the essential element of publication to a third person.

In *Nelson v. Lapeyrouse Grain Corp.*, 534 So. 2d 1085 (Ala. 1988), the Court considered whether statements made to an employee of a corporation in the investigation of theft could be said to have been published to a third person. In that case, the President of the Corporation made certain statements to a non-managerial employee (Taylor) concerning theft by another employee to determine whether he had any knowledge of the plaintiff stealing grain. 534 So. 2d at 1088. The *Nelson* Court held that the alleged defamatory statements made to Taylor were not publications:

> Applying the McDaniel/Burney rule to the instant case, we hold that Lapeyrose is not vicariously liable for Brothers's alleged defamatory communications to other **[*48]** corporate employees during the course of the theft investigation. Since Lapeyrouse is in the business of buying and selling grain, it follows that investigating shortages of grain concerns corporate business. Because Brothers's communications were necessary in determining the culpability of Nelson and other employees, they concerned corporate business and fell within the McDaniel/Burney 'no publication' rule. The fact that Brothers communicated Nelson's involvement in the theft scheme to a non-managerial employee, Taylor, is irrelevant for purposes of determining Lapeyrouse's liability. . . ."

534 So. 2d at 1093. *Nelson* controls the result in this case because the alleged statement relied on by Watson in this case was made, if at all, by one corporate employee to another in the course of a theft investigation. Watson's assertion that *Nelson* is distinguishable because the co-employee there was not himself being accused of theft is specious. The principles addressed by the *Nelson* court were predicated on the fact that the communications at issue "concerned corporate business" in general, not the guilt or innocence of the person to whom the statement at **[*49]** issue was being made. *See also, Reynolds Metals Co. v. Mays*, 547 So. 2d 518, 524 (Ala. 1989)("This Court has adopted the rule that there is no publication by a corporation in the case of a communication by one corporate employee to another corporate employee, in the course of transacting the corporation's business and in the line of their duty as employees of the corporation, about a fellow corporate employee.") The theft investigation being conducted by Lapeyrouse and even the arson investigation being conducted in *Reynolds* are indistinguishable from the investigation conducted by McRae's in this case. There is simply no evidence that any McRae's employee published a defamatory statement concerning Watson to any third party. Accordingly, there was no publication. n13

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n13 The defamation claim must be dismissed against Store Manager Eitt for the further reason that there is no allegation or evidence that he published the alleged defamatory statement. The allegation is that the statement was made by "Floyd Smith and/or Jeff Nobles," not by Mr. Eitt.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

**[\*50]**

## H. Conversion:

In Count VIII, Watson asserts a claim for the tort of conversion contending that defendants "converted plaintiff's McRae's, Inc. credit card as well as other property of the plaintiff." (Amended Complaint, P 65). This contention is based on the factual allegation that "defendant Thomas Eitt asked plaintiff to turn over all McRae's, Inc.'s property, including her McRae's charge card she had had for over twelve years." (Amended Complaint, P 20). Watson's only testimony on this point was that Store Manager Tom Eitt said "I want you to give the all your personal belongings -- McRae's belongings, and he asked for my McRae's credit card, and I gave it to him." (Plaintiff's dep. at 83).

**HN30** "Conversion is the wrongful taking . . . of another person's property" and in order to maintain a conversion claim plaintiff must show "legal title and the immediate right of possession to the property." *Lambert v. Independent Life and Accident Ins. Co., 994 F. Supp. 1385, 1393 (M.D. Ala. 1998).* Watson is claiming that McRae's committed the tort of conversion by asking plaintiff to return *its* property. Watson has not shown either legal title to or any right **[\*51]** of immediate possession to the McRae's card issued to her, a burden she bears. Watson's contention that "there is a dispute of fact as to this issue" (Plaintiff's Opposition Brief at 49) is also specious and unsupported by any authority disputing McRae's ownership of every credit cards it issues. There can be no claim for conversion under these facts. n14

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n14 The conversion claim against Nobles is also due to be dismissed because there is no allegation that he asked for return of the McRae's property.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

## I. Outrage:

Watson has abandoned this claim as against all defendants. Plaintiff's Opposition Brief at 4.

## CONCLUSION AND ORDER

For the reasons stated above, the Court concludes that no material issues of fact exist and that the defendants are entitled to judgment in their favor as a matter of law. It is therefore **ORDERED** that defendants' motions for summary judgment (Doc. 57 and 61) be and are hereby **GRANTED** and that **JUDGMENT** be entered in favor of the defendants, McRae's, Inc., **[\*52]** McRae's of Alabama, Inc., Jeffrey Nobles, Thomas Eitt and Floyd Smith, and against the plaintiff, Karen Marie Watson, the plaintiff to have and recover nothing of these defendants. Costs are taxed against the plaintiff.

DONE this 24th day of May, 2001.

WB Hand

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 7257    Page 24 of 24

Case 2:05-cv-00562-MEF-CSC    Document 36-11    Filed 04/18/2006    Page 46 of 46

SENIOR DISTRICT JUDGE

**JUDGMENT** - JUDGEMENT ENTERED ON DOCKET 5/25/01

It is **ORDERED, ADJUDGED** and **DECREED** that defendants' motions for summary judgment (Doc. 57 and 61) be and are hereby **GRANTED** and that **JUDGMENT** be and is hereby entered in favor of the defendants, McRae's, Inc., McRae's of Alabama, Inc., Jeffrey Nobles, Thomas Eitt and Floyd Smith, and against the plaintiff, Karen Marie Watson, the plaintiff to have and recover nothing of these defendants. Costs are taxed against the plaintiff.

DONE this 24th day of May, 2001.

WB Hand

SENIOR DISTRICT JUDGE

Service: **Get by LEXSEE®**
Citation: **2001 U.S. Dist. LEXIS 7257**
View: **Full**
Date/Time: Tuesday, April 18, 2006 - 1:50 PM EDT

\* Signal Legend:

● - Warning: Negative treatment is indicated

Q - Questioned: Validity questioned by citing refs

⚠ - Caution: Possible negative treatment

◆ - Positive treatment is indicated

Ⓐ - Citing Refs. With Analysis Available

❶ - Citation information available

\* Click on any *Shepard's* signal to *Shepardize*® that case.

 **LexisNexis®**   About LexisNexis  |  Terms & Conditions
Copyright © 2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.